Roger A. MORRISON, an individual; Roger A. Morrison, as the Personal Representative in the Matter of the Estate of Cindy Marie Kathlien Morrison; Roger A. Morrison, as the Best Friend to Andrew Ryan Morrison and Kylie Beth Morrison, the minor children of Cindy Marie Kathlien Morrison; Donald Evig, an individual; and Patricia Evig, an individual, Plaintiffs,

v.

COLORADO PERMANENTE MEDICAL GROUP, P.C., a Colorado professional corporation; Dr. Suzanne Simmons–McNitt, an individual; Community Hospital Association, a/k/a Boulder Community Hospital, a Colorado nonprofit corporation; and Linda Curran, an individual, Defendants.

Civil Action No. 97–B–711.

United States District Court, D. Colorado.

Nov. 17, 1997.

Kenneth E. Peck, Bette K. Bushell, Denver, CO, for Plaintiffs.

Bruce A. Montoya, Teresa L. Thrailkill, Pryor, Johnson, Montoya, Carney & Karr, P.C. Englewood, CO, J. Stephen Mullen, Retherford, Mullen, Johnson & Bruce, Colorado Springs, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendants Colorado Permanente Medical Group, P.C. (CPMG or Kaiser) and Dr. Suzanne Simmons–McNitt (Dr. McNitt)(arbitration defendants) move to dismiss the complaint of plaintiffs Roger A. Morrison (Mr. Morrison), Donald Evig (D.Evig), and Patricia Evig (P.Evig)(collectively, plaintiffs) pur-

suant to Fed.R.Civ.P. 12(b)(1) for lack of jurisdiction over the subject matter. The arbitration defendants also move to compel arbitration. Defendant Community Hospital Association a/k/a Boulder Community Hospital (BCH) moves to dismiss claim one pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief may be granted. After consideration of the motions, briefs, and counsels' oral arguments, I will grant the arbitration defendants' motion to dismiss and deny BCH's motion to dismiss.

## I.

### A. *Parties*

1. Mr. Morrison is: (a) the surviving spouse of Cindy Marie Kathlien Morrison (Ms. Morrison); (b) the personal representative of Ms. Morrison's estate; and (c) the father and "Best Friend" of Andrew Ryan Morrison and Kylie Beth Morrison, the surviving minor children of Ms. Morrison. Plaintiff Donald Evig is Ms. Morrison's surviving father and plaintiff Patricia Evig is Ms. Morrison's surviving mother.

CPMG was at all times relevant to this action a Colorado professional corporation transacting business in Colorado and authorized to practice medicine in Colorado. "Kaiser" refers collectively to the employees, physicians, officers, directors, and agents of CPMG. Dr. McNitt was a physician licensed to practice medicine in Colorado. BCH is a Colorado nonprofit hospital which owns and operates an acute care hospital (BCH) in Boulder, Colorado. Defendant Ms. Linda Curran (Nurse Curran) was a registered nurse at all times pertinent to this complaint.

### B. *Claims*

Plaintiffs bring fifteen claims: 1) violation of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd against BCH; 2) negligent emergency room nursing diagnosis and treatment against Nurse Curran; 3) negligent failure to refer or consult against Nurse Curran; 4) loss of chance of cure against Nurse Curran; 5) negligent misrepresentation against Nurse Curran; 6) *respondeat superior* against Community Hospital Association; 7) negli-

gent emergency room diagnosis and treatment against Dr. McNitt; 8) negligent failure to refer or consult against Dr. McNitt; 9) loss of chance of cure against Dr. McNitt; 10) negligent misrepresentation against Dr. McNitt; 11) *respondeat superior* against Dr. McNitt; 12) *respondeat superior* against CPMG; 13) declaratory judgment against all defendants; 14) *respondeat superior* against BCH; and 15) outrageous conduct against all defendants. Jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1367(a).

## II.

### A.

■ Defendants CPMG and Dr. McNitt move to dismiss plaintiffs' pendent state claims for lack of jurisdiction over the subject matter pursuant to Fed.R.Civ.P. 12(b)(1). In support, CPMG and Dr. McNitt rely upon an arbitration provision contained in a group health plan issued to Ms. Morrison's employer. Ms. Morrison had enrolled in the plan and was covered by it at all times relevant to this action.

In response to a Rule 12(b)(1) motion, the district court has wide discretion to consider affidavits, documents, and even hold a limited evidentiary hearing. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.1995); *Wheeler v. Hurdman*, 825 F.2d 257, 259 n. 5 (10th Cir.1987). Here, each party to the Rule 12(b)(1) motion submitted affidavits and exhibits, all of which I will consider in ruling on this motion. The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir.1974).

Following oral argument, arbitration defendants submitted the application for enrollment form signed by Ms. Morrison on August 1, 1993. Plaintiffs moved to strike the document arguing that before I may consider it, the Rule 12(b)(1) motion must be converted to a Rule 56 motion with allowed discovery. I disagree. As stated, in the jurisdictional context of Rule 12(b)(1), I may consider properly this documents. *See Holt*, 46 F.3d at 1003; *Hurdman*, 825 F.2d at 259 n. 5.

The enrollment agreement and payroll deduction authorization signed by Ms. Morrison provides in part: "I agree to binding arbitration, if so required by the health plan. I request that my pay be reduced by the amount of my required contribution to the cost of the plan." In turn, the Kaiser Foundation Health Plan Service Agreement, in effect when Ms. Morrison enrolled through her employer, K–Mart, contains an arbitration clause which states:

### 8. ARBITRATION OF CLAIMS

**A. SCOPE OF ARBITRATION.** Any claim arising from alleged violation of a duty incident to this Agreement, irrespective of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted to binding arbitration if the claim is asserted:

(1) By a Member, or by a Member's heir or personal representative, or by a person claiming that a duty to him or her arises from a Member's relationship with Health Plan, Hospitals or Medical Group incident to this Agreement ("Claimant/s"),

(2) For any reason, including, but not limited to, death, mental disturbance, bodily injury or economic loss arising from the rendition or failure to render services, or the provision or failure to provide benefits under this Agreement or the consideration or defense of claims descried in this Section,

(3) For monetary damages exceeding the jurisdictional limit of the Small Claims Court, and

(4) Against one or more of the following ("Respondent/s"):

(a) Health Plan,

(b) Hospitals,

(c) Medical Group,

(d) Any Physician, or

(e) Any employee or agent of the foregoing.

**B. INITIATING ARBITRATION.** Claimant/s shall initiate arbitration by serving a Demand for Arbitration that specifies the nature and legal basis of the claim and the type of loss sustained, including, with specificity, the alleged (1) nature of the injuries suffered, (2) acts or omissions that caused the injuries, and (3) date and place of the acts or omissions. All claims against Respondent/s based upon the same incident, transaction or related circumstance must be arbitrated in one proceeding. Colorado Rules of Civil Procedure and Colorado Revised Statutes pertaining to the prerequisites for the filing and maintenance of a civil action will govern the Demand for Arbitration, except as otherwise provided in this Section 8. Claimant/s shall serve all Respondent/s reasonably servable, and the arbitrators shall have jurisdiction only over Respondent/s actually served. All Respondent/s served with a Demand for Arbitration must be parties. Natural persons must be served as in a Colorado civil action, and any other Respondent/s must be served by registered letter, postage prepaid addressed to Respondent/s in care of Health Plan and the address provided in Section 10–K.

**C. FEES AND COSTS.** No party shall be entitled to recover pre-award interest separate and apart from the principal amount of any award entered at arbitration, if any. Costs, excluding the fees and expenses of the arbitrators, shall be awarded by the arbitrators at the conclusion of the arbitration pursuant to Colorado Rules of Civil Procedure and Colorado Revised Statutes. Attorney fees may be awarded by the arbitrators at the conclusion of the arbitration pursuant to Colorado Revised Statutes.

**D. SELECTION AND POWERS OF ARBITRATOR/S.** Unless the parties otherwise agree, within 30 days after service of a Demand for Arbitration, Claimant/s and all Respondent/s served shall each designate an arbitrator and give written notice of such designation to the other. No Claimant or Respondent may act as his or her own arbitrator. Within 30 days after these notices have been given, the two arbitrators so selected shall select a neutral arbitrator and give notice of the section to Claimants and all Respondents served. The parties shall bear the fees and expenses of the neutral arbitrator equally. Each party shall bear the fees

and expenses of the arbitrator that it selects. The three arbitrators shall hold a hearing within a reasonable time thereafter. Except where otherwise agreed to by the parties, arbitration shall be held within the Service Area at the time and place designated by the neutral arbitrator.

**E. GENERAL PROVISIONS.** A claim shall be waived and forever barred if (1) on the date the Demand for Arbitration of the claim is served, the claim, if asserted in a civil action, would be barred by the applicable Colorado statute of limitations, or (2) the Claimants fail to pursue the arbitration claim in accord with the procedures prescribed herein with reasonable diligence. All notices or other papers required to be served or convenient for the conduct of arbitration proceedings following service of the Demand for Arbitration shall be served by mailing the same, postage prepaid, to such address as each party gives for this purpose. After initial service on Respondents has been made pursuant to Section 8–B above, Claimants and Respondents may conduct discovery as in a Colorado civil action. All discovery must be concluded no later than twenty-one (21) days prior to the hearing on the claim set by the arbitrators. Disclosure of witnesses, expert witnesses, exhibits and pre-arbitration legal issues shall be governed by the provisions of Colorado Rules of Civil Procedure 16, or as otherwise ordered by the arbitrators.

**F. SPECIAL PROVISIONS FOR MEDICARE PLUS MEMBERS.** For Medicare Plus Members, the provisions of the Section 8 apply only to claims asserted on account of death, mental disturbance or bodily injury arising from rendition or failure to render services under this agreement.

**G. WAIVER.** The arbitration procedures required by this Section 8 may be waived only upon written agreement of the Claimants and Respondents.

**H. UNIFORM ARBITRATION ACT.** This arbitration clause is made subject to and incorporates by reference the Colorado Uniform Arbitration Act of 1975, C.R.S. § 13–22–201, et seq. (1986 Cum.Supp.). The decision of the arbitrators shall be deemed final and binding as to all claims which were made or could have been made against any and all persons or entities who could have been Respondents as described in Section 8–A(4), whether or not a Demand for Arbitration was actually made against such persons or entities.

Defs. CPMG and Dr. McNitt Mtn. to Dismiss, Ex. D. pp. 12–13.

On April 19, 1996, plaintiffs' counsel sent counsel for arbitration defendants a memorandum in which plaintiffs' counsel stated "consider this written notice to be our demand for arbitration." Pltf. Opp. Ex. 2. On April 26, 1996 plaintiffs' counsel stated in a letter to arbitration defendants' counsel, "[e]nclosed is a hard copy of the Complaint and Demand for Arbitration, which I faxed to you last week." Reply Brief Ex. B. In a letter dated May 17, 1996, counsel for the arbitration defendants stated, in pertinent part:

> I am enclosing the service agreement from Kaiser Foundation Health Plan which was in effect at the time of Ms. Morrison's enrollment. This agreement sets the procedure for arbitration. I am also enclosing a draft arbitration agreement. I would ask that you review these documents with your clients and call to finalize the agreement. We will also need to discuss the selection of an arbitrator or arbitrators to hear the case.

> This is also to confirm that our response to your demand for arbitration was due on May 9, 1996. You have graciously agreed to an extension of time until May 20, 1996 to file our response.

Pltf. Opp. Ex.3. On May 20, 1996, the arbitration defendants sent their Response to the Complaint in Arbitration. Reply Ex. C. Plaintiffs' counsel never responded to defense counsel's May 17, 1996 letter. They also did not attempt to negotiate the terms of the "draft" arbitration agreement. Further, plaintiffs and their counsel never signed the draft arbitration agreement or any other document binding them to arbitrate their claims against the arbitration defendants. Resp. Brief p. 3. Thereafter, plaintiffs' counsel forwarded to CPMG's counsel and BCH's coun-

sel copies of a First Amended Complaint in arbitration.

From August 14, 1996 until approximately March 21, 1997, there was no communication from plaintiffs' counsel to defendants' counsel. On March 21, 1997, plaintiffs sent to the arbitration defendants a First Amended Complaint in Arbitration which apparently added BCH as a party defendant. On April 9, 1997, the arbitration defendants' counsel stated in a letter to plaintiffs' counsel:

[the] Complaint in Arbitration ... was answered by our office on May 20, 1996....

. . . . .

We are enclosing an Answer on behalf of our clients to your latest Complaint.... [T]he Answer to the Amended Arbitration Complaint is being filed on behalf of [Kaiser] and Dr. Suzanne Simmons–McNitt only.... Boulder Community Hospital will not submit to your demand to arbitrate....

. . . . .

[W]e are interested in knowing your position with respect to the arbitration contract which was forwarded to you in May 1996. Please advise concerning your client's position so we can get the arbitration contract finalized and select an arbitrator or arbitrators to hear this matter.

Mtn. Ex.D. However, on April 8, 1997, the day before this letter was written, plaintiffs filed this action.

Arbitration defendants contend that the arbitration agreement is a bar to this Court's jurisdiction. Plaintiffs respond that the arbitration clause is invalid under the Colorado Health Care Availability Act (CHCAA), § 13–64–403, and, thus, this Court has subject matter jurisdiction.

The CHCAA provides, in pertinent part:

(3) Any such [arbitration] agreement shall have the following statement set forth as part of the agreement: "It is understood that any claim of medical malpractice, including any claim that medical services were unnecessary or unauthorized or were improperly, negligently or incompetently rendered or omitted, will be determined by submission to binding arbitration in accordance with the provisions of the 'Uniform Arbitration Act of 1975', part 2 of article 22 of title 13, Colorado Revised Statutes, and not by a lawsuit or resort to court process except as Colorado law provides for judicial review of arbitration proceedings. The patient has the right to seek legal counsel concerning this agreement, and has the right to rescind this agreement by written notice to the physician within ninety days after the agreement has been signed and executed by both parties unless said agreement was signed in contemplation of the patient being hospitalized, in which case the agreement may be rescinded by written notice to the physician within ninety days after release or discharge from the hospital or other health care institution. Both parties to this agreement, by entering into it, have agreed to the use of binding arbitration in lieu of having any such dispute decided in a court of law before a jury."

(4) Immediately preceding the signature lines for such an agreement, the following notice shall be printed in at least ten-point, bold-faced type:

**NOTE: BY SIGNING THIS AGREEMENT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL BINDING ARBITRATION RATHER THAN BY A JURY OR COURT TRIAL.**

**YOU HAVE THE RIGHT TO SEEK LEGAL COUNSEL AND YOU HAVE THE RIGHT TO RESCIND THIS AGREEMENT WITHIN NINETY DAYS FROM THE DATE OF SIGNATURE BY BOTH PARTIES UNLESS THE AGREEMENT WAS SIGNED IN CONTEMPLATION OF HOSPITALIZATION IN WHICH CASE YOU HAVE NINETY DAYS AFTER DISCHARGE OR RELEASE FROM THE HOSPITAL TO RESCIND THE AGREEMENT.**

**NO HEALTH CARE PROVIDER SHALL WITHHOLD THE PROVISION OF EMERGENCY MEDICAL SERVICES TO ANY PERSON BECAUSE OF THAT PERSON'S FAILURE OR REFUSAL TO SIGN AN AGREEMENT**

CONTAINING A PROVISION FOR BINDING ARBITRATION OF ANY DISPUTE ARISING AS TO PROFESSIONAL NEGLIGENCE OF THE PROVIDER.

NO HEALTH CARE PROVIDER SHALL REFUSE TO PROVIDE MEDICAL CARE SERVICES TO ANY PATIENT SOLELY BECAUSE SUCH PATIENT REFUSED TO SIGN SUCH AN AGREEMENT OR EXERCISED THE NINETY–DAY RIGHT OF RESCISSION.

§ 13–64–403, C.R.S.

It is undisputed that the agreement in this case does not contain the aforementioned statutory language or notice. Moreover, in *Colorado Permanente Medical Group, P.C.v. Evans,* 926 P.2d 1218 (Colo.1996), the Colorado Supreme Court held that the text and form of an arbitration provision identical to section 8 quoted above was void and unenforceable as a matter of law. *Id.* at 1228.

However, the arbitration defendants argue that CHCAA arbitration provisions § 13–64–403(3) and (4) are preempted by the Federal Arbitration Act (FAA), 9 U.S.C. § 2 which states:

> A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Reply Brief p. 5. Arbitration defendants state that the transactions contemplated by the Kaiser Service Agreement constitute "transactions involving commerce" in that the agreement provides for medical services in other states to Colorado members. Service Agreement ¶¶ 5B, 12R, 12S. Also, according to arbitration defendants, the performance of the agreement with respect to the purchase and shipping of medications and supplies, the acquisition of building materials, the performance of certain laboratory tests, and the recruitment of physicians involves out-of-state sources.

In *Colorado Permanente Medical Group, PC. v. Evans,* the Colorado Supreme Court expressly declined to address the applicability of the FAA to the CPMG medical services agreement arbitration clause because the issue was not raised in the trial court. *Id.* at 1221. However, the United States Supreme Court has held that "[c]ourts may not ... invalidate arbitration agreements under state laws applicable only to arbitration provisions." *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, ——, 116 S.Ct. 1652, 1655, 134 L.Ed.2d 902 (1996); *Cf. Avedon Engineering, Inc. v. Seatex,* 126 F.3d 1279, 1287 (10th Cir.1997)("[S]pecial preconditions for enforcement of arbitration clauses not required for another term of contract [is] preempted by the FAA"). Further, the Court stated, "[S]tate law ... is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [the text of § 2]." *Id.* quoting *Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 2527 n. 9, 96 L.Ed.2d 426 (1987). "By enacting § 2, ... Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts.'" *Id.* quoting *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 511, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974).

The Colorado Uniform Arbitration Act, 13–22–210 *et seq.,* C.R.S., places no text or form limitations on arbitration agreements. Thus, the effect of the CHCAA arbitration provisions §§ 13–64–403(3) and (4) is to place arbitration clauses in medical services agreements in a class apart not only from "any contract" but also from all other arbitration agreements. By doing so, the CHCAA "singularly limits their validity." *Doctor's Assoc.,* 517 U.S. ——, 116 S.Ct. at 1657. I hold that the CHCAA medical services arbitration provisions are "inconsonant" with, and therefore preempted by, the Federal Arbitration Act (FAA). *Id.*

Based on *Doctor's Associates, Inc.,* the arbitration clause in the medical services

agreement in this case is valid under the FAA. Accordingly, I am without subject matter jurisdiction as to plaintiffs' claims brought against arbitration defendants CPMG and Dr. McNitt. Because arbitration defendants elected to enforce the arbitration provisions of Section 8, and because paragraph G of subsection 8 provides for waiver only upon written agreement of both parties, I perceive no waiver by plaintiffs and their arbitration rights are returned to the *status quo ante.*

Having decided that the arbitration clause is valid, I need not address these defendants' alternative argument that plaintiffs' conduct in commencing arbitration constitutes an independent contract to arbitrate. Nevertheless, plaintiffs' conduct is a clear indication of their recognition of the existence, as a matter of fact, of the agreement to arbitrate set forth in section 8 of the group health plan.

### B.

■ Curiously, defendants BCH and Nurse Curran assert they are not bound by the medical and hospital service agreement arbitration provision. C/O ¶ 150. BCH and Nurse Curran chose not to join the Fed. R.Civ.P. 12(b)(1) motion to dismiss. Even so, plaintiffs seek a declaration whether the arbitration provision is enforceable against BCH and Nurse Curran. Apparently, plaintiffs are concerned that arbitration proceedings with defendants CPMG and Dr. McNitt would preclude this action from proceeding against defendants BCH and Nurse Curran. I discern no bar to plaintiffs' action proceeding here against BCH and Nurse Curran.

Section 13–21–203(1), C.R.S. states, in pertinent part, that "[t]here shall be only one civil action ... for recovery of damages for the wrongful death of any one decedent." As stated by the arbitration defendants, the language of §§ 13–21–201 through 203 indicates clearly that the language in § 13–21–203(1) means that all persons eligible to bring suit must bring the suit jointly, as opposed to multiple suits brought by separate plaintiffs for the wrongful death of a single person. Moreover, plaintiffs assume that an arbitration is a "civil action." I disagree.

Arbitration is an alternative dispute resolution mechanism designed to avoid the need for filing a civil action or to resolve an existing civil action. Moreover, cases and statutes discuss consistently the terms "arbitration" and "civil action" in a manner that leaves no doubt that arbitration is a creature separate from, and not just a form of, a civil action. For example, the D.C. Circuit Court of Appeals states, "[d]espite the strong FAA policy of ordering arbitration hearings and implementing arbitration awards, minimal standards of procedural fairness must be satisfied before a *civil action* may be stayed and *arbitration* ordered...." *Cole v. Burns Int'l Security Services,* 105 F.3d 1465, 1482 (D.C.Cir.1997). Also, 28 U.S.C. § 652(a)(1)(A) provides that a district court may "allow the referral to arbitration of any civil action ... pending before it if the parties consent to arbitration." I conclude that an arbitration proceeding is not a civil action as contemplated by the Colorado Wrongful Death statute. Therefore, this civil action may proceed against defendants BCH and Nurse Curran while arbitration proceedings are held between plaintiffs and arbitration defendants CPMG and Dr. McNitt.

### III.

■ Pursuant to Fed.R.Civ.P. 12(b)(6), BCH moves to dismiss claim one for violation of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd on the grounds that 1) Ms. Morrison was not denied treatment or discharged from BCH for economic reasons as she was covered under a Kaiser Permanente health insurance policy and 2) plaintiffs' claims represent traditional medical malpractice claims and, therefore, are not proper claims under EMTALA. Brief pp. 8–9. Both arguments are devoid of merit.

Under Rule 12(b)(6), a district court may dismiss a complaint for failure to state a claim upon which relief can be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). If the plaintiff has pled facts that would support a legally cogni-

zable claim for relief, a motion to dismiss should be denied. *Id.* In reviewing the sufficiency of the complaint, all well-pled facts, as opposed to conclusory allegations, must be taken as true. *Weiszmann v. Kirkland & Ellis,* 732 F.Supp. 1540, 1543 (D.Colo. 1990). All reasonable inferences must be liberally construed in the plaintiff's favor. *Id.*

The well pled facts of plaintiffs' complaint, taken as true, reflect the following events. Ms. Morrison went to the BCH emergency room on Saturday, April 22, 1995 at 3:15 p.m. complaining of a severe migraine-like headache and a high temperature. Before being discharged, she also complained of pain in her buttocks and a red, inflamed spot appeared on her left flank. Ms. Morrison's temperature was recorded to be 103.9 degrees at 6:53 p.m. C/O ¶ 21. Ms. Morrison was given I.V. fluids and Dr. McNitt discharged Ms. Morrison at 10:00 p.m. that evening.

Ms. Morrison returned to the BCH emergency room the following morning, Sunday, April 23, 1995, complaining of intense pain in her abdomen, hips, and legs. The medical records indicate that when she arrived at BCH on Sunday morning, Ms. Morrison had blood blisters on both buttocks, a pale complexion, low blood pressure, and rapid respirations.

Between 11:00 a.m. and 11:30 a.m., the blood blister on Ms. Morrison's left flank ruptured. Red blood and a clear fluid drained from the blister soaking her top sheet, bottom sheet, and gown. Mr. Morrison and Ms. Evig detected a foul odor in the air after the blood blister ruptured. C/O ¶ 27. Dr. McNitt told Mr. Morrison, Ms. Evig, and Nurse Curran that Ms. Morrison did not have an infection.

When Dr. McNitt and Nurse Curran examined Ms. Morrison again at 3:10 p.m. on Sunday, they discovered that a second blood blister on Ms. Morrison's right hip had ruptured and discharged a bloody, foul-smelling fluid. C/O ¶ 31. Dr. McNitt told Mr. Morrison and Ms. Evig that Ms. Morrison had a bed sore. *Id.* at ¶ 33. Around 3:40 p.m. on Sunday, April 23, 1995, Dr. McNitt discharged Ms. Morrison.

Ms. Morrison returned to the BCH emergency room later that evening complaining of severe pain in her abdomen and legs. Drs. Douglas Morgan and Charles Jones examined Ms. Morrison and diagnosed her with Necrotizing Fasciitis/Myositis i.e., "flesh eating bacteria." C/O ¶¶ 43, 48. Ms. Morrison was taken to surgery at approximately 12:15 a.m. on Monday, April 24, 1995, where she underwent a bilateral radical debridement. *Id.* at ¶ 44. While in surgery, Ms. Morrison went into cardiac arrest and was resuscitated. After surgery, she was returned to the intensive care unit where she suffered cardiac arrest five times between 4:00 a.m. and 6:00 a.m. Ms. Morrison died at 6:05 a.m. on Monday, April 24, 1995. *Id.* at ¶¶ 46–47. Autopsy determined that the cause of death was Necrotizing Fasciitis/Myositis. *Id.* at ¶ 48. At all times pertinent to this action, Ms. Morrison was covered under a Kaiser Permanente health insurance policy.

### A.

The EMTALA provides, in pertinent part:

**§ 1395dd. Examination and treatment for emergency medical conditions and women in labor**

**(a) Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section ) exists.

**(b) Necessary stabilizing treatment for emergency medical conditions and labor**

**(1) In general**

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an

emergency medical condition, the hospital must provide either——

**(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

**(B)** for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

### (c) Restricting transfers until individual stabilized

#### (1) Rule

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual unless—

**(A)(i)** the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

**(ii)** a physician (within the meaning of section 2395x(r)(1) of this title) has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual ... from effecting the transfer....

### (e) Definitions

In this section:

**(1)** The term "emergency medical condition" means——

**(A)** a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in——

**(i)** placing the health of the individual ... in serious jeopardy,

**(ii)** serious impairment to bodily functions, or

**(iii)** serious dysfunction of any organ or part....

**(2)** The term "participating hospital" means hospital that has entered into a provider agreement under section 1395cc of this title.

**(3)(A)** The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility....

**(B)** The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility....

**(4)** The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital....

In *Collins v. DePaul Hosp.*, 963 F.2d 303, 308 (10th Cir.1992), the Court stated:

We do not agree with counsel that the fact that Collins was non-indigent, i.e. he could and did pay his medical and hospital bills, does not defeat his [EMTALA] action. 42 U.S.C. § 1395dd(a) encompasses, by its terms, 'any individual (whether or not eligible for benefits under this subchapter) ....' the fact that Congress, or some of its members, viewed [EMTALA] as a so-called 'anti-dumping' bill, i.e., a bill designed to prohibit hospitals from 'dumping' poor or uninsured patients in need of emergency care, does not subtract from its use of the broad term 'any individual.'

*Id.* at 308. (internal citations omitted).

■ BCH did not discuss or even mention the *Collins* opinion in their opening or reply brief. However, as BCH seemed to concede at argument, and I agree, *Collins* is disposi-

tive on the issue whether a non-indigent individual can bring an EMTALA action. She can. Thus, I will deny BCH's motion to dismiss claim one on this ground.

### B.

█ BCH argues that plaintiffs' claims represent traditional medical malpractice claims and, therefore, are not proper claims under EMTALA. I am not persuaded.

Plaintiffs state that the EMTALA claim does not rest on any allegation of negligence or medical malpractice. Resp. Brief p. 9. Rather, plaintiffs argue that their EMTALA claim is based on "BCH's breach of its statutory duties to: (a) screen to determine whether Ms. Morrison was suffering from an emergency medical condition, 42 U.S.C. § 1395dd(a); and/or (b) stabilize Ms. Morrison's emergency medical condition before discharging her from the Hospital, 42 U.S.C. § 1395dd(c)." *Id.* at ¶¶ 56–64.

In *Collins,* the Tenth Circuit described the circumstances in which a person could state an EMTALA claim against a hospital:

> Once it is established that the plaintiff showed up at the hospital's emergency room with an emergency medical condition, the hospital can violate § 1395dd either (1) by failing to detect the nature of the emergency through inadequate screening procedures under subsection (a), or (2) under subsection (b), if the emergency nature of the patient's condition is detected, by failing to stabilize the condition before releasing the plaintiff.

*Id.* at 308.

In support of claim one, plaintiffs allege that on April 22, 1995, and during the first visit to the BCH Emergency Room on April 23, 1995, Ms. Morrison requested treatment and examination for a medical condition. C/O ¶¶ 56–57. Also, plaintiffs allege that during both of these visits, BCH failed to provide an appropriate medical screening examination. *Id.* at ¶¶ 57, 60. Further, plaintiffs allege that BCH had actual knowledge during both of these visits that Ms. Morrison was suffering from an emergency medical condition which had not been stabilized when she was discharged. *Id.* at ¶¶ 58, 61. These

allegations, which I must accept as true for purposes of the Rule 12(b)(6) motion to dismiss, are sufficient to withstand BCH's motion to dismiss.

Accordingly, it is ORDERED that:

1. plaintiffs' motion to strike is DENIED;

2. the motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(1) filed by defendants Colorado Permanente Medical Group, Inc. and Dr. Suzanne Simmons–McNitt is GRANTED;

3. claims seven, eight, nine, ten, eleven, thirteen and fifteen are DISMISSED as to defendant Dr. Suzanne Simmons–McNitt;

4. claims twelve, thirteen, and fifteen are DISMISSED as to defendant Colorado Permanente Medical Group, P.C.;

5. judgment SHALL ENTER DISMISSING defendants Colorado Permanente Medical Group, P.C. and Dr. Suzanne Simmons–McNitt from this action with plaintiffs' arbitration rights returned to the *status quo ante;*

6. the motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) filed by Community Hospital Association, a/k/a Boulder Community Hospital is DENIED;

7. the motion to compel arbitration is DENIED as moot; and

8. upon filing of a bill of costs within 10 days from the date of this Order, defendants' Colorado Permanente Medical Group, PC. and Dr. Suzanne Simmons–McNitt motion for attorney fees associated with their Rule 12(b)(1) motion is GRANTED pursuant to Fed.R.Civ.P. 54(d).