Lawrence S. ALLEN, M.D.; Michael K. Miller, M.D.; Timothy R. Collins, M.D.; and Colorado Permanente Medical Group, P.C., Petitioners,

v.

Karen PACHECO, Respondent.

No. 01SC744.

Supreme Court of Colorado, En Banc.

June 9, 2003.

Rehearing Denied June 30, 2003.

Pryor, Johnson, Montoya, Carney & Karr, P.C., Elizabeth C. Moran, Greenwood Village, CO, Attorneys for Petitioners.

Law Offices of Gary S. Cohen, Gary S. Cohen, Christine Van Coney, Denver, CO, Attorneys for Respondent.

Leventhal & Brown, P.C., Anthony Viorst, Denver, CO, Attorneys for Amicus Curiae Colorado Trial Lawyers Assn.

Chief Justice MULLARKEY delivered the Opinion of the Court.

## I. Introduction

In this wrongful death case, we address the question of whether the respondent Karen Pacheco is bound by an arbitration provision contained in her deceased husband's agreement with his health maintenance organization ("HMO"). The court of appeals held that Pacheco was not bound by the arbitration agreement because the agreement does not apply to wrongful death actions filed by a

member's non-party spouse. *Pacheco v. Allen*, 55 P.3d 141, 143–44 (Colo.App.2001). We affirm the court of appeals on different grounds, holding that although the arbitration provision in the HMO contract does extend to wrongful death actions filed by a member's non-party spouse, Pacheco is not bound by the arbitration provision because it does not comply with the Colorado Health Care Availability Act ("HCAA"), §§ 13–64–403(3) and (4), 5 C.R.S. (2002). The HCAA governs the arbitration provision in this case because the McCarran–Ferguson Act, 15 U.S.C. § 1012(b) (1997), exempts sections 13–64–403(3) and (4) of the HCAA from federal preemption by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2 (1999).

## II. Facts and Procedural History

The Kaiser Foundation Health Plan of Colorado ("Kaiser") is an HMO that provides health care services and health care insurance to its enrollees. Pacheco's husband was a Kaiser member, but Pacheco herself never became a party to the Kaiser contract. The contract between Kaiser and Pacheco's husband contained an arbitration clause requiring "any claim of medical malpractice" to be submitted to binding arbitration. The clause included claims for "death" asserted by "a Member's heir or personal representative":

> Claims … *shall be submitted to binding arbitration if the claim is asserted: By a Member, or by a Member's heir or personal representative,* or by a person claiming that a duty to him or her arises from a Member's relationship with Health Plan, Hospitals or Medical Group incident to this Agreement … *For any reason, including, but not limited to, death* … *Against* one or more of the following: Health Plan, Hospitals, Medical Group, *Any Physician,* or Any employee or agent of the foregoing.

(emphasis added).

In 1997, Pacheco's husband died after extended hospitalization for pancreatitis. Pa-

checo subsequently filed a wrongful death action against Dr. Lawrence S. Allen, Dr. Timothy R. Collins, Dr. Michael K. Miller, and their employer, the Colorado Permanente Medical Group, P.C. ("CPMG") (collectively, "the providers").[1] CPMG is a professional medical corporation that contracts with Kaiser to provide medical services to Kaiser members.

The trial court concluded that the arbitration clause in the contract between Kaiser and Pacheco's husband was enforceable against Pacheco because a surviving spouse is an "heir" under the plain and ordinary meaning of the agreement. The trial court also concluded that the arbitration provision was enforceable even though the provision failed to comply with the Colorado HCAA, because the FAA federally preempted the statute. Pacheco's case was then sent to arbitration, where the arbiter entered an award in favor of the providers. The trial court subsequently denied Pacheco's motion to vacate the award and Pacheco appealed, arguing that the trial court erred by binding her to the arbitration agreement.

The court of appeals reversed, holding in a published opinion that the arbitration clause was not enforceable against Pacheco because (1) a contract cannot bind a non-party to an agreement; (2) Pacheco was not her husband's "heir"; (3) a wrongful death cause of action under the Colorado Wrongful Death Act, §§ 13–21–201 to 203.7, 5 C.R.S. (2002), is a wholly separate action not covered by the terms of the Kaiser agreement; and (4) generally, the broad language of the Kaiser agreement does not extend to non-party spouses bringing wrongful death claims. *Pacheco*, 55 P.3d at 143–44. In so holding, the court of appeals found it unnecessary to reach the issue of federal preemption.

We granted certiorari to determine whether Pacheco is bound by the arbitration clause[2] and now affirm the judgment of the

---

1. Pacheco's claims against the treating hospital and other physicians were ultimately dismissed.

2. We granted certiorari on the following two issues:
    1. Whether plaintiff wife is required to arbitrate her claim for the wrongful death of

her husband, where her husband's agreement with his health maintenance organization (HMO) includes a provision requiring the arbitration of all claims for medical malpractice, including claims for "death," and claims by a "Member's heir or person-

court of appeals on different grounds. We hold that although the scope of the arbitration provision does include wrongful death actions filed by a member's non-party spouse, Pacheco nevertheless is not bound by the provision because the provision does not comply with the statutory requirements set forth in the Colorado HCAA. Sections 13–64–403(3) and (4) of the HCAA govern the arbitration provision in this case because the McCarran–Ferguson Act exempts these sections of the HCAA from federal preemption.

## III. Analysis

### 1. The Arbitration Agreement Binds a Non–Party Spouse Asserting a Wrongful Death Claim

Before addressing the statutory preemption issues raised in this case, we first explain why the scope of the Kaiser arbitration provision includes wrongful death actions filed by a member's non-party spouse.

■■■■ An arbitration agreement is a contract, the interpretation of which is a matter of law that we review de novo. *See State Farm Mut. Auto. Ins. Co. v. Stein*, 940 P.2d 384, 387 (Colo.1997) (addressing insurance policies generally). To determine whether the parties have agreed to submit the issue in question to arbitration, we follow state law principles governing contract formation. *City & County of Denver v. Dist. Ct.*, 939 P.2d 1353, 1361 (Colo.1997). We must construe the terms of the agreement in a manner that allows each party to receive the benefit of the bargain, and the scope of the agreement must faithfully reflect the reasonable expectations of the parties. *Id.* at 1361, 1363. In other words, we must interpret the agreement in a manner that best effectuates the intent of the parties. *Id.* at 1361.

■■■■ We ascertain the parties' intent by looking to the plain language of the agree-

al representative," where plaintiff wife is not a party to the agreement.

2. Whether, notwithstanding the court of appeals' failure to reach this issue, the Federal Arbitration Act (FAA) preempts the restrictive provisions of § 13–64–403, 5 C.R.S. (2002), and requires enforcement of the arbitration provision.

ment. *State Farm*, 940 P.2d at 387. We will enforce the agreement as written unless there is an ambiguity in the language; courts should neither rewrite the agreement nor limit its effect by a strained construction. *Id.* Thus, like any contract, an arbitration agreement must be given effect according to the plain and ordinary meaning of its terms. *Id.*

■■■■ In determining whether an ambiguity exists, we must ask whether the disputed provision is reasonably susceptible on its face to more than one interpretation. *Id.* We also evaluate the agreement as a whole and construe the language in harmony with the plain and generally accepted meaning of the words employed, unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended. *Id.*

■■■■ If ambiguities are found in the arbitration agreement, we must afford the parties a presumption in favor of arbitration and resolve doubts about the scope of the arbitration clause in favor of arbitration.[3] *See City & County of Denver*, 939 P.2d at 1364. More specifically, we must compel arbitration unless we can say "with positive assurance" that the arbitration clause is not susceptible of any interpretation that encompasses the subject matter of the dispute. *Id.* (citations omitted). Moreover, a "broad or unrestricted" arbitration clause makes the strong presumption favoring arbitration apply with even greater force. *Id.* (citations omitted).

■■■■ In short, as we examine whether Kaiser and Pacheco's husband, via the contract between them, intended the scope of the arbitration agreement to include both (1) wrongful death claims and (2) non-party spouses, we must look to the plain and ordinary meaning of the agreement itself and

3. Although the court of appeals correctly stated that ambiguities in an insurance contract generally are construed against the drafter, *see Pacheco*, 55 P.3d at 144 (citing *State Farm*, 940 P.2d at 390), the court of appeals failed to recognize this court's clear holding in *City & County of Denver*, 939 P.2d at 1364, that courts must afford ambiguities in arbitration agreements a presumption in favor of arbitration.

construe any ambiguities in favor of arbitration.

In applying the above legal guidelines to this case, we look first to the plain language of the arbitration agreement. The contract in this case states, in pertinent part:

It is understood that *any claim of medical malpractice* including any claim that medical services were unnecessary or unauthorized or were improperly, negligently, or incompetently rendered or omitted, *will be determined by submission to binding arbitration* ...

Claims ... *shall be submitted to binding arbitration if the claim is asserted: By a Member, or by a Member's heir or personal representative,* or by a person claiming that a duty to him or her arises from a Member's relationship with Health Plan, Hospitals or Medical Group incident to this Agreement ... *For any reason, including, but not limited to, death,* mental disturbance, bodily injury or economic loss arising from the rendition or failure to render services ... Against one or more of the following: Health Plan, Hospitals, Medical Group, Any Physician, or Any employee or agent of the foregoing.

(emphasis added).

In construing this agreement, the court of appeals concluded that the above provisions do not apply to wrongful death claims brought by non-party spouses such as Pacheco. We disagree. In interpreting the words of the agreement in accord with their plain and ordinary meaning, we find that the agreement applies not only to (1) wrongful death claims as claims for "death," but also to (2) non-party spouses as "heirs."

First, the arbitration agreement plainly applies to *"any claim* of medical malpractice" and any claim brought *"[f]or any reason, including, but not limited to, death* ...." The plain and ordinary meaning of this wording reveals a clear intent to include wrongful death claims within the scope of claims that must be submitted to binding arbitration. Even if we were to characterize the provision as ambiguous due to the fact that the exact term "wrongful death" is not used in the agreement, the language of the agreement as a whole is very broad. Because the presumption in favor of arbitration is strongest where the language of the agreement is "broad or unrestricted," *City & County of Denver,* 939 P.2d at 1364, the arbitration provision in this case is best construed as one that includes wrongful death claims.

Despite the contract's highly inclusive reference to claims brought *"[f]or any reason, including, but not limited to, death,"* the court of appeals held that wrongful death claims are not covered by the terms of the agreement because under the Colorado Wrongful Death Act, §§ 13–21–201 to 203.7, 5 C.R.S. (2002), a wrongful death cause of action "is wholly separate and distinct from any action [Pacheco's] husband might have maintained." *Pacheco,* 55 P.3d at 143 (citing *Fish v. Liley,* 120 Colo. 156, 208 P.2d 930 (1949); *Rowell v. Clifford,* 976 P.2d 363 (Colo.App.1998)). Although it is true that a wrongful death claim is separate and distinct from a cause of action the deceased could have maintained had he survived, this observation is not helpful in determining whether separate wrongful death claims are in fact included within the plain and ordinary meaning of the agreement. Because the plain language of the agreement in this case refers to "all claims" including those brought for "death," and because we must apply a strong presumption in favor of arbitration, we find that the arbitration agreement applies to wrongful death claims.

■ Having established that the scope of the agreement includes wrongful death actions, we now determine whether the scope of the agreement also includes non-party spouses. We hold that the arbitration agreement does apply to non-party spouses because (a) a non-party may be bound by the terms of an agreement if the parties so intend and because (b) a spouse is an "heir" under the meaning of the agreement.

■ The court of appeals reasoned that the arbitration clause does not apply to a non-party such as Pacheco because a non-party to a contractual agreement cannot be bound by its terms. *Pacheco,* 55 P.3d at 143. This statement of the law is inaccurate. Although it is true that in general, only the parties to a contract are bound by its terms,

a non-party may fall within the scope of the agreement if the parties so intend. *Jefferson County Sch. Dist. No. R–1 v. Shorey*, 826 P.2d 830, 843 (Colo.1992); *Parker v. Ctr. For Creative Leadership*, 15 P.3d 297, 298 (Colo. App.2000); *Everett v. Dickinson & Co., Inc.*, 929 P.2d 10, 12 (Colo.App.1996); *Eychner v. Van Vleet*, 870 P.2d 486, 489 (Colo.App. 1993).[4]

In this case, the arbitration agreement binds not only claims brought by signatory members, but also claims brought by a member's "heir or personal representative, or by a person claiming that a duty to him or her arises from a Member's relationship with [Kaiser] incident to this Agreement." The contract clearly does not require that these heirs, personal representatives, or persons claiming special duties actually sign and become parties to the contract before they can fall within the scope of the arbitration agreement. Because the contract reflects the intent of the parties to bind claimants other than signatory members, the fact that Pacheco is a non-party does not by itself exempt her from the arbitration agreement. So long as she is within the category of heirs, personal representatives, or persons claiming special duties, she is bound by the arbitration agreement.

In this case, Pacheco is her husband's "heir" under the meaning of the agreement. To reach this conclusion, we follow the same legal analysis used above: we look first to the plain and ordinary meaning of the agreement and then construe any ambiguities in favor of arbitration. Here, the term "heir" as used in the arbitration agreement is am-

biguous because the term may or may not include spouses[5]—as we explain below, the term is reasonably susceptible on its face to more than one interpretation. *See State Farm*, 940 P.2d at 387.

On one hand, it is well-established that the definition of "heirs" as used in the Colorado Wrongful Death Act, §§ 13–21–201 to 204, 5 C.R.S. (2002) does not include spouses.[6] *See, e.g., Hindry v. Holt*, 24 Colo. 464, 468, 51 P. 1002, 1004 (1897); *Whitenhill v. Kaiser Permanente*, 940 P.2d 1129, 1131 (Colo.App. 1997) (the term "heirs" under the Wrongful Death Act refers only to lineal descendants of the deceased). The court of appeals in this case relied on the Wrongful Death Act's definition of "heirs" when it refused to characterize Pacheco as an "heir" under the meaning of the arbitration agreement. *Pacheco*, 55 P.3d at 143.

On the other hand, some Colorado cases have generally referred to spouses as "heirs." *See, e.g., Binkley v. Switzer*, 75 Colo. 1, 3, 223 P. 757, 758 (1923) (stating that a decedent left "his widow as his heir"); *Tanski v. Tanski*, 820 P.2d 1143, 1144 (Colo.App.1991) (referring to a surviving spouse as an "heir at law"); *Clint v. Stolworthy*, 144 Colo. 597, 600, 357 P.2d 649, 651 (1960) (referring to "heirs other than the widow"). Moreover, the commonly understood notion of the term "heir" is very broad, loosely defined as "a person who inherits real or personal property." Black's Law Dictionary 727 (7th ed.1999). Also, the arbitration agreement here is not limited to wrongful death claims—the agreement requires "all claims" to be submitted to

---

4. In *City & County of Denver*, 939 P.2d at 1370, this court stated generally that "[a] non-party to an agreement containing an ADR clause may not be compelled to use the ADR procedures." *City & County of Denver* did not, however, involve an ADR provision specifically addressing non-parties. *See id.* at 1359. Here, in contrast, we construe an arbitration provision expressly purporting to bind not only the signatory, but also certain non-parties who are in privity with the signatory, namely an "heir or personal representative or ... a person claiming that a duty to him or her arises from a Member's relationship with [Kaiser]."

5. The trial court did not find ambiguity, stating, "interpreting the words of the agreement in accord with their plain and ordinary meaning man-

dates that the word 'heir' be read to include a surviving spouse."

6. As used in the Wrongful Death Act, section 13–21–201(1), 5 C.R.S. (2002), the term "heirs" designates which class of persons may file a wrongful death claim if the spouse has not already filed a claim within one year of the decedent's death:

(a) In the first year after such death:
 (I) By the spouse of the deceased;
 (II) Upon the written election of the spouse, by the spouse and the heir or heirs of the deceased;
 (III) Upon the written election of the spouse, by the heir or heirs of the deceased; or
 (IV) If there is no spouse, by the heir or heirs of the deceased.

binding arbitration. Therefore, there is no automatic connection between the definition of "heirs" as used in the Wrongful Death Act and the definition of "heir" as used in this agreement. Thus, we may reasonably interpret the term "heir" as a term that includes spouses.

As with any ambiguity in an arbitration agreement, we must resolve doubts about the scope of the arbitration agreement in favor of arbitration. *City & County of Denver*, 939 P.2d at 1364. We must compel arbitration unless we can say "with positive assurance" that the arbitration clause is not susceptible of any interpretation that encompasses the subject matter of the dispute. *See id.* Because the term "heir" as used in the arbitration agreement is ambiguous and is susceptible of an interpretation that encompasses spouses, we construe the term inclusively and hold that spouses are within the scope of the agreement.

Our inclusive interpretation not only adheres to the presumption in favor of arbitration, but also avoids an absurd result. In this case, an exclusion of spouses from the term "heirs" would run counter to the arbitration agreement's otherwise broad terms. If spouses are not "heirs," a member's husband or wife would not need to arbitrate any claims whatsoever, let alone claims asserting wrongful death. Meanwhile, the member, the member's children, the member's personal representative, and any person claiming a special duty must still arbitrate "all claims" brought "[f]or any reason." Given the broad terms of the arbitration agreement, we find it highly unlikely that the parties intended to exclude spouses in such a sweeping manner.

In sum, we reject the court of appeals' analysis and agree with the trial court that the arbitration agreement applies to both (1) wrongful death actions and (2) non-party spouses. Nevertheless, we affirm the court of appeals' holding that the arbitration agreement is unenforceable against Pacheco, because the agreement does not comply with the requirements set forth in the Colorado HCAA.

## 2. The McCarran–Ferguson Act Exempts the Colorado HCAA from Federal Preemption by the FAA

■ The parties do not dispute that the arbitration agreement in this case does not comply with the regulations set forth in the Colorado HCAA, or Health Care Availability Act. Sections 13–64–403(3) and (4) of the HCAA mandate specific language and typeface requirements for arbitration provisions contained in medical services agreements. The General Assembly enacted these regulations with the express intent "that an arbitration agreement be a voluntary agreement between a patient and a health care provider." § 13–64–403(1), 5 C.R.S. (2002). In this case, the arbitration agreement between Kaiser and Pacheco's husband lacks the language and bold-faced type notice required by the HCAA. Normally, this non-compliance alone would render the agreement unenforceable against Pacheco.

Here, however, the parties have raised the issue of whether the HCAA is federally preempted by the FAA, or Federal Arbitration Act. The FAA upholds the validity of arbitration agreements contained in any "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. If the FAA preempts the HCAA, the HCAA will not govern the arbitration agreement and the agreement is enforceable against Pacheco. If the HCAA is not preempted, Kaiser's non-compliance with the HCAA is fatal and Pacheco is not bound by the agreement.

■ Typically, when a state enacts arbitration statutes of general applicability and the statute is inconsonant with the FAA, the FAA preempts that state law. *See, e.g., Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 687–88, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *Hart v. Orion Ins. Co.*, 453 F.2d 1358, 1360 (10th Cir.1971) (finding preemption where the arbitration statute was one of general application); *Hamilton Life Ins. Co. of N.Y. v. Republic Nat'l Life Ins. Co.*, 408 F.2d 606, 611 (2d Cir.1969) (finding preemption where the arbitration statute applied generally to all contracts). The Colorado HCAA is not a statute of general applicability because it targets only arbitration agreements contained in medical services con-

tracts. Its detailed arbitration regulations clearly conflict with the FAA, which broadly states that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *See* 9 U.S.C. § 2. The Federal District Court for the District of Colorado has held that because sections 13–64–403(3) and (4) of the HCAA and the FAA are "inconsonant," the state regulations are preempted. *Morrison v. Colo. Permanente Med. Group,* 983 F.Supp. 937, 943 (D.Colo.1997).

Our preemption analysis, however, does not end here. A critical issue not addressed in *Morrison* but raised by Pacheco in this case is the question of whether the McCarran–Ferguson Act "reverse-preempts" the FAA preemption of the HCAA arbitration regulations. The McCarran–Ferguson Act provides, in relevant part:

> *No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance ...* unless such Act specifically relates to the business of insurance. *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended ... shall be applicable to the business of

insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012(b) (emphasis added).

In other words, under the first clause of section 1012(b), the McCarran–Ferguson Act exempts a state statute from federal preemption if the state law is enacted "for the purpose of regulating the business of insurance" and if the federal statute does not specifically "relate to the business of insurance." It is undisputed here that the FAA does not relate to the business of insurance. Therefore, the remaining issue left for us to resolve is whether sections 13–64–403(3) and (4) of the Colorado HCAA are state laws enacted "for the purpose of regulating the business of insurance" under the meaning of the McCarran–Ferguson Act. If so, the FAA will not preempt the HCAA and the arbitration agreement in this case is unenforceable.

The United States Supreme Court has decided two key cases clarifying when a state law has been enacted "for the purpose of regulating the business of insurance" under the meaning of the McCarran–Ferguson Act.[7] In *SEC v. National Securities, Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Court focused on the relationship between the insurance company and the policyholder and held that any state statute "aimed at protecting or regulating this relationship," either directly or indirectly, is a law regulating the "business of insurance" under the meaning of the Act. *Id.*[8] More recently, the Supreme Court re-emphasized

---

7. Other cases addressing the meaning of "business of insurance" in an ERISA context are similar to McCarran–Ferguson cases, but the Supreme Court has recently made clear that the two inquiries are separate and distinct. *Kentucky Ass'n of Health Plans, Inc. v. Miller,* —— U.S. ——, ——, 123 S.Ct. 1471, 1479, 155 L.Ed.2d 468 (2003).

8. In *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), the Supreme Court identified three specific, but non-determinative, considerations to be weighed when determining whether certain *practices by private actors* constitute the "business of insurance." These criteria include whether the practice: (1) has the effect of transferring or spreading a policyholder's risk; (2) is an integral part of the policy relationship between the insurer and the insured; and (3) is limited to entities within the insurance industry. *Id.* (citing *Group*

*Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979)). We do not specifically rely on the *Pireno* and *Royal Drug* factors because these factors arise from cases seeking to characterize conduct by private actors in the antitrust context under the *second clause* of section 1012(b). *See United States Dep't of Treasury v. Fabe,* 508 U.S. 491, 504–05, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). These factors do not apply directly to the broader issue, under the *first clause* of section 1012(b), of whether a state law has been enacted for the "purpose of regulating the business of insurance." *Id.; see also Miller,* —— U.S. ——, 123 S.Ct. 1471, 155 L.Ed.2d 468.

In this case, the trial court incorrectly framed the *Pireno* factors as a mandatory three-part test, of which all three factors had to be met before the law could be characterized as regulating the "business of insurance."

the *National Securities* principle in *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993), maintaining that the essence of regulating the business of insurance is to regulate the relationship between the insurance company and the policyholder. *See id.* at 501, 113 S.Ct. 2202. Under this principle, a federal law must yield to a state statute to the extent that the state statute "furthers the interests of policyholders." *Id.* at 502, 113 S.Ct. 2202.

Following *Fabe*, the Tenth Circuit Court of Appeals has similarly focused the "business of insurance" test on whether the state statute in question was enacted for the purpose of protecting policyholders. *Davister Corp. v. United Republic Life Ins. Co.*, 152 F.3d 1277, 1281 (10th Cir.1998) (finding that McCarran–Ferguson exempted a state court's blanket stay order from FAA preemption because the stay "manifests a purpose of protecting policyholders" in a liquidation setting). *Davister* is consistent with a line of cases focusing on whether the state law directly regulates the contractual relationship between an insurer and insured. *See, e.g., Mutual Reinsurance Bureau v. Great Plains Mut. Ins. Co., Inc.*, 969 F.2d 931, 933 (10th Cir.1992) (holding that a Kansas statute expressly invalidating an arbitration agreement contained in an insurance contract is a statute that touches the core of the 'business of insurance' under the meaning of McCarran–Ferguson); *Cox v. Woodmen of the World Ins. Co.*, 347 S.C. 460, 556 S.E.2d 397, 401–02 (S.C.Ct.App.2001) (a South Carolina statute barring arbitration in an insurance contract is "an integral part of the policy relationship between the insurer and the insured" because it places limits on the enforceability of an agreement to spread risk).

In this case, sections 13–64–403(3) and (4) of the Colorado HCAA not only directly regulate contracts between health insurance policyholders and their insurers (in this case, HMOs [9]), but also further the interests of these policyholders. Sections 13–64–403(3) and (4) directly regulate health insurance contracts by requiring HMOs to include specific notice language, in ten-point, bold-faced type, of any arbitration agreement contained within the health insurance contract. If the HMO that drafted the insurance contract fails to give the policyholder proper notice of the arbitration agreement, the HCAA protects the policyholder by invalidating that provision of the contract. By regulating health insurance contracts drafted by the health care provider and by protecting patients who are insured by that provider, sections 13–64–403(3) and (4) of the HCAA qualify as laws enacted "for the purpose of regulating the business of insurance." *Accord Smith v. PacifiCare Behavioral Health of Cal., Inc.*, 93 Cal.App.4th 139, 161, 113 Cal.Rptr.2d 140 (2001) (holding that the McCarran–Ferguson Act applies to a state statute specifically regulating the words that an HMO can use when including an arbitration clause in its medical services plan).

It is irrelevant that other sections of the HCAA, outside of sections 13–64–403(3) and (4), address medical malpractice issues not involving the relationship between an insurer and insured. *Fabe* makes clear that a statute, "to the extent that it regulates policyholders," qualifies as a statute "enacted for the purpose of regulating the business of insurance" under the meaning of the McCarran–Ferguson Act. *Fabe*, 508 U.S. at 508, 113 S.Ct. 2202. Moreover, the fact that sections 13–64–403(3) and (4) of the HCAA apply to "health care providers" instead of exclusively to insurers such as HMOs does not nullify our conclusion that sections 13–64–403(3) and (4) were enacted for the "purpose of regulating the business of insurance." As long as the statute is not one of general applicability, it is not necessary that the state statute relate only to insurance or that the statute be in the form of an insurance code. *Great Plains*, 969 F.2d at 934. Therefore, the fact that sections 13–64–403(3) and (4) of the

---

9. HMOs simultaneously function as health care providers and health care insurers. *See Rush Prudential HMO, Inc., v. Moran*, 536 U.S. 355, 367–70, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002); *Imbler v. PacifiCare of Cal., Inc.*, 103 Cal.App.4th 567, 573, 126 Cal.Rptr.2d 715 (2002). Given the modern reality that HMOs have virtually replaced traditional health care insurers, the relationship between an HMO "medical service provider" and "patient" is the relationship between a "medical insurer" and "insured."

HCAA technically include non-insurer "health care providers" such as physicians does not prevent these sections of the HCAA from qualifying as statutes enacted "for the purpose of regulating the business of insurance" under the meaning of the McCarran–Ferguson Act.

In sum, to the extent that sections 13–64–403(3) and (4) of the HCAA do specifically regulate the relationship between a health insurer and its policyholder, *see National Securities*, 393 U.S. at 460, 89 S.Ct. 564, and to the extent that these provisions of the HCAA do further the interests of these policyholders by ensuring adequate notice of arbitration agreements, *see Fabe*, 508 U.S. at 502, 113 S.Ct. 2202, the HCAA is a statute "enacted for the purpose of regulating the business of insurance" under the meaning of the McCarran–Ferguson Act.

The McCarran–Ferguson Act therefore exempts sections 13–64–403(3) and (4) of the HCAA from federal preemption by the FAA, meaning that those sections of the HCAA govern the arbitration agreement in this case. Because the agreement here does not comply with sections 13–64–403(3) and (4) of the HCAA, the agreement is unenforceable and Pacheco is not required to submit her wrongful death claim to binding arbitration.

## IV. Conclusion

For the foregoing reasons, we reject the analysis of the court of appeals but uphold the result it reached. We conclude that the scope of the arbitration agreement between Kaiser and Pacheco's husband includes wrongful death claims brought by non-party spouses. The arbitration agreement is unenforceable, however, because it does not comply with the Colorado HCAA. Therefore, we affirm the judgment of the court of appeals.

Justice KOURLIS dissents, and Justice BENDER joins in the dissent.

Justice KOURLIS, dissenting:

Because I do not read the Colorado Health Care Availability Act, § 13–64–403, 5 C.R.S.

(2002), as a law aimed at regulating the "business of insurance," I do not view the McCarran–Ferguson Act, 15 U.S.C. § 1012(b) (1997), as applicable. For that reason, although I concur in the Majority's conclusion that the arbitration agreement at issue here applies to wrongful death actions and to non-party spouses, I respectfully dissent from the conclusion that the McCarran–Ferguson Act exempts sections 13–64–403(3) and (4) of the Colorado Health Care Availability Act from federal preemption.

### I. The Colorado Health Care Availability Act

The analysis in this case is complex and, for me, is best undertaken in simple steps. There are three relevant pieces of legislation, state and federal, which come into play. The first is the Colorado Health Care Availability Act ("HCAA"), specifically Part 4, Procedures and Evidence in Medical Malpractice Actions. §§ 13–64–401 *et. seq.*, 5 C.R.S. (2002). The HCAA evidences the General Assembly's intent that arbitration agreements be a voluntary and knowing contractual undertaking between the patient and the health care provider. To that end, the statute requires certain bold-faced language in the agreement, designed to notify the patient that by signing the agreement, he or she is "agreeing to have any issue of medical malpractice decided by neutral binding arbitration rather than by a jury or court trial." § 13–64–403(4). It is undisputed that in this case, the agreement did not contain that notice and thus, would be unenforceable.[1] To this point in the analysis, therefore, by operation of Colorado law, the arbitration award in this case would be vacated and Karen Pacheco would be entitled to proceed in her wrongful death lawsuit.

### II. The Federal Arbitration Act

The next step in the analysis, however, involves the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et. seq.* (1999). I agree with the Majority that the FAA would apply to this contract, but because I would

---

1. We so held in *Colorado Permanente Medical Group, P.C. v. Evans*, 926 P.2d 1218, 1226 (Colo. 1996). We did not address the FAA preemption argument in that case because it was not raised and preserved at the trial court level.

also hold that it is the focal or dispositive statute, I expand upon the Majority's discussion somewhat. The FAA states that:

> A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The purpose of the FAA is to "overcome courts' refusals to enforce agreements to arbitrate" and is grounded in Congress' powers under the Commerce Clause. *Allied–Bruce Terminix Co. v. Dobson,* 513 U.S. 265, 270, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). In enacting the FAA, Congress "declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). Generally, then, the FAA preempts state law that conflicts with it, by operation of the Supremacy Clause. U.S. Const. art. VI, cl. 2.

The agreement here pertains to transactions involving commerce, in that it provides for medical services in other states to its Colorado members. *See Grohn v. Sisters of Charity Health Svcs. Colo.,* 960 P.2d 722, 725–26 (Colo.App.1998) (hospital's business activities, which include payment of out-of-state medical costs of in-state insureds, and receipt of goods and services from out-of-state vendors constitute transactions "involving commerce" within the ambit of the FAA). Hence, the only question is whether the FAA would otherwise apply to invalidate the specific proscriptions of the HCAA and render the arbitration agreement enforceable even though it does not comply with the HCAA.

The FAA establishes federal substantive law that governs issues of enforceability for all arbitration agreements that involve commerce. *Perry v. Thomas,* 482 U.S. 483, 489, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

*Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). To the extent that any state law conflicts with the FAA, that state law is preempted by operation of the Supremacy Clause of the United States Constitution. *See* U.S. Const. art. VI, cl. 2; *Southland Corp.,* 465 U.S. at 16, 104 S.Ct. 852; *Doctor's Assoc., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996).

An arbitration clause almost identical to the one at issue here was held enforceable by the United States District Court for the District of Colorado in *Morrison v. Colorado Permanente Medical Group, P.C.,* 983 F.Supp. 937 (D.Colo.1997). In that case, the court viewed *Doctor's Associates* as dispositive. The Supreme Court, in *Doctor's Associates,* held that the FAA preempted a Montana statute, which also required arbitration agreements to contain a special notice, in underlined capital letters. The Court held:

> By enacting § 2, we have several times said, Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed "upon the same footing as other contracts." Montana's § 27–5–114(4) directly conflicts with § 2 of the FAA because the State's law conditions the enforceability of arbitration agreements on compliance with a special notice requirement not applicable to contracts generally. The FAA thus displaces the Montana statute with respect to arbitration agreements covered by the Act.

517 U.S. at 687, 116 S.Ct. 1652 (internal citations omitted). Following the Court in *Doctor's Associates,* the court in *Morrison* held that the medical services arbitration provisions found in sections 13–64–403(3) and (4) of the HCAA were preempted by the FAA. 983 F.Supp. at 943.

By creating special language requirements for arbitration provisions in medical service agreements, it is my view that the HCAA does indeed impose special conditions on medical arbitration agreements not applicable to contracts generally. Accordingly, those special requirements imposed by Colorado legislation would be preempted by the

FAA, and the arbitration clause in this agreement would be valid and enforceable even though it does not contain the special notice required by the HCAA.

### III. The McCarran–Ferguson Act

The final step in this inquiry then must turn to the McCarran–Ferguson Act, 15 U.S.C. § 1012(b) (1997), which the Majority holds would operate to preclude the FAA from applying and would therefore revive the Colorado statutory requirements. That Act provides that "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance...." 15 U.S.C. § 1012(b). Pacheco argues, and the Majority agrees, that this Act operates as a bar to what would otherwise be FAA preemption because sections 13–64–403(3) and (4) of the Colorado HCAA involve the "business of insurance." On this point, I disagree.

The history of the McCarran–Ferguson Act is relevant to the limited construction I here suggest. McCarran–Ferguson was enacted in response to the Supreme Court's decision in *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). In that case, the Court held that insurance transactions were subject to federal regulation in general under the Commerce Clause, and to the antitrust laws in particular. *Id.* at 553, 560–61, 64 S.Ct. 1162. Prior to that, the states had assumed the exclusive regulation of insurance. Congress acted by passing the McCarran–Ferguson Act to assure that the states would continue to have "a free hand in regulating the dealings between insurers and their policyholders," *Sec. & Exch. Comm'n v. Nat'l Sec., Inc.*, 393 U.S. 453, 459, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), but did not intend "to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision [in *South–Eastern*]." *Id.* (quoting H.R.Rep. No. 143, 79th Cong., 1st Sess., 3 (1945)).

In *National Securities*, the Supreme Court was called upon to determine whether an action by the Securities and Exchange Commission to invalidate a merger of insurance companies that had been approved by the State of Arizona was barred by the McCarran–Ferguson Act. The Court held that it was not, noting in its analysis that the McCarran–Ferguson Act was intended to protect the dealings between insurance companies and their policyholders, and not to protect the many other activities in which insurance companies engage. *Id.* at 460, 89 S.Ct. 564. In an effort to explain the reach of the Act and what would constitute the "business of insurance," the Court stated:

> Certainly the fixing of rates is part of this business.... The selling and advertising of policies, and the licensing of companies and their agents are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance.... The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder.

*Id.* (internal citations omitted). Importantly, the Court distinguished between provisions of state law focusing on the relationship between *stockholders* and the company, and provisions dealing specifically with service to *policyholders*. *Id.* The Court held that the former was not within the scope of McCarran–Ferguson, while the latter was.[2] *Id.* at 460–62, 89 S.Ct. 564.

The Court again provided guidance for the application of the McCarran–Ferguson Act in

---

**2.** While the court found that the provision requiring the State Director of Insurance to conclude that the security of and services rendered to policyholders would not be substantially reduced by a proposed merger before approving it was within the scope of McCarran–Ferguson, as it clearly related to the "business of insurance," the Court found no conflict between the federal and state law and allowed application of both. *Id.* at 462, 89 S.Ct. 564.

*Union Labor Life Insurance Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). In that case, the Court held that a health insurance provider's use of a professional association's peer review committee to determine reasonableness and necessity of chiropractic charges did not constitute the "business of insurance" so as to be exempted from application of federal antitrust laws. *Id.* at 129, 102 S.Ct. 3002. The Court outlined three factors, commonly referred to as the *Pireno* factors, to assist in determining what constitutes the "business of insurance:" "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." *Id.* (citing *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979)). While noting that not one of the factors was in itself determinative, the court found that the Peer Review Committee met none of the factors and was not, therefore, part of the "business of insurance." *Id.* at 129–32, 102 S.Ct. 3002.

In *United States Department of Treasury v. Fabe*, 508 U.S. 491, 504, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993), the Court held that an Ohio bankruptcy priority statute relating to liquidation of a bankrupt insurance company escaped federal bankruptcy law preemption by operation of the McCarran–Ferguson Act because the Ohio law was "designed to carry out the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy." In *Fabe*, the Court did observe that it had developed and applied the *Pireno* factors in the context of analyzing Sherman Antitrust Act issues under the second clause of the McCarran–Ferguson Act, and that those factors were, therefore, not definitive. *Id.* at 505, 113 S.Ct. 2202; *see also Davister Corp. v. United Republic Life Ins. Co.*, 152 F.3d 1277, 1281 (10th Cir.1998) (holding that a Utah state statute consolidating all claims against a liquidating insurer was enacted to protect policyholders and was, therefore, exempt from application of the FAA by reason of the McCarran–Ferguson Act).

However, even without the *Pireno* factors, the court in *Fabe* held that the business of insurance preserved to state regulation relates to the rights of policyholders. *Fabe*, 508 U.S. at 506, 113 S.Ct. 2202.

Hence, to the extent that *Pireno* continues to apply to non-antitrust inquiries, I would observe that the Colorado HCAA provisions at issue are not "integral to the policy relationship between" the medical service provider and its insurer, nor do they regulate, constrain, set benefits, exclusions or limitations that effect the relationship between the insurer and the policyholders.

Even if the proper inquiry in determining whether the statute at issue is whether the statute is "aimed at protecting or regulating" the relationship between the insurance company and the policyholder, Maj. op. at 382–383, I suggest that the HCAA cannot meet that test. The provisions of the Colorado HCAA at issue here, specifically part 4, deal with "Procedures and Evidence in Medical Malpractice Actions." As the title indicates, the primary purpose of these provisions is to control and constrain medical malpractice actions, not to regulate the insurance policy itself. Indeed, the effect of the statute may be to reduce medical malpractice premiums; however, that consequence does not change the fact that the provisions were enacted to control medical malpractice *actions*, not medical malpractice insurance within the meaning of the McCarran–Ferguson Act. It is particularly evident that sections 13–64–403(3) and (4) of the HCAA is not related to the "business of insurance" because its focus is solely on protecting the informed choice of *patients*, so as not to bind them to an arbitration clause without their knowledge. That purpose is not about insurance.

Beginning with the easy axiom, if the HCAA arbitration provision were a general law concerning what an arbitration agreement must contain in order to be valid in Colorado, that law would likely find no shelter within the McCarran–Ferguson Act, but would rather be construed as a law of general application. *See Hart v. Orion Ins. Co.*, 453 F.2d 1358 (10th Cir.1971) (enforcing an arbitration agreement by holding the McCar-

ran–Ferguson Act did not apply because the court found the provisions had general applicability to contract disputes); *Hamilton Life Ins. Co. v. Republic Nat'l Life Ins. Co.*, 408 F.2d 606 (2nd Cir.1969) (finding that arbitration statutes did not regulate the "business of insurance"; rather, they regulated the method of handling contract disputes generally); *Am. Bankers Ins. Co. v. Crawford,* 757 So.2d 1125 (Ala.1999) (enforcing an arbitration agreement in a policy despite State's anti-arbitration statute because statute did not regulate the "business of insurance" as to prevent enforcement of the policy under the FAA). As the Colorado HCAA applies generally to medical service providers and their patients, and not specifically to the relationship between insurers and their insureds, it would be a law of general application, and thus not subject to the McCarran–Ferguson savings clause.

Thus, it is the placement of the arbitration clause limitation language within the HCAA that must be the pivotal factor—it must evidence the General Assembly's intent to regulate only certain arbitration agreements that impact upon or relate to insurance. I do not so read the HCAA. Rather, I read the HCAA not as aimed at the relationship between the medical services provider and the insurer, but rather as being aimed at the relationship between the medical services provider and the patient. Granted, the General Assembly did indeed express its intent in enacting the legislation to contain the increasing costs of malpractice insurance,[3] but they chose to address that goal by limiting the remedies available to a patient claiming malpractice against a medical services provider—not by regulating the amount which an insurer could charge in premiums or by regulating the nature of coverage the insurers could or should provide. For example, although "qualified insurer" is a defined term, it ap-

pears only twice in the HCAA: in the section concerning periodic installment obligations, section 13–64–206, and in the section concerning funding that obligation, section 13–64–208.

The HCAA is about containing and limiting malpractice awards, with the intent thereby of reducing malpractice insurance premiums and stemming the exodus of doctors from the profession. To say that it is "aimed at the business of regulating insurance" is to say that any legislation that has an effect on insurance premiums is aimed at the business of regulating insurance. So, for example, legislation requiring drivers to wear seat belts or motorcycle riders to wear helmets would be aimed at the business of regulating insurance because it could have an effect on insurance premiums. In short, I suggest that the interpretation the Majority affords the McCarran–Ferguson Act sweeps with a broad and wide arc that could swallow federal preemption under the Supremacy Clause.

### IV. Conclusion

Accordingly, although I concur in portions of the Majority opinion, I dissent from the ultimate result and would instead reverse the court of appeals' opinion and uphold the trial court's judgment enforcing the arbitration award.

I am authorized to state that Justice BENDER joins in this dissent.

---

**3.** Notably, the result advocated by the Majority would have the converse result. Application of the McCarran–Ferguson Act to the Colorado HCAA operates to disadvantage the doctor, as a malpractice insurance policyholder, because he will be subjected to a full trial, rather than having recourse in the enforcement of the arbitration award.