Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 27, 2016

**2016 CO 53**

**No. 15SC87, <u>Pinnacol Assurance v. Hoff</u>—Workers' Compensation Insurance—
Promissory Estoppel—Certificates of Insurance—Notice of Cancellation.**

In this case, the supreme court considers whether an insurer had a contractual or

statutory obligation to notify a non-insured holder of a certificate of insurance when the

insurance policy evidenced by the certificate was cancelled.  Because the certificate said

notice of cancellation "will be delivered in accordance with the policy provisions" and

the insurance policy did not promise notice to certificate holders, the supreme court

concludes that the insurer had no contractual obligation to provide notice of

cancellation to the certificate holder.  The supreme court further concludes that no

provision or public policy contained in the Workers' Compensation Act required the

insurer to provide such notice either.  Therefore, the supreme court reverses the

judgment of the court of appeals.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

### 2016 CO 53

### Supreme Court Case No. 15SC87
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 13CA1798

### Petitioner:

Pinnacol Assurance,

v.

### Respondents:

Norma Patricia Hoff; Hernan Hernandez; Alliance Construction & Restoration, Inc.; MDR Roofing, Inc.; and Industrial Claim Appeals Office of the State of Colorado.

### Judgment Reversed
*en banc*
June 27, 2016

**Attorneys for Petitioner:**
Pinnacol Assurance
Harvey D. Flewelling
  *Denver, Colorado*

**Attorneys for Respondent Norma Patricia Hoff:**
Scott A. Meiklejohn, LLC
Scott A. Meiklejohn
  *Denver, Colorado*

Worstell & Associates
David Worstell
Thomas J. Connell
  *Denver, Colorado*

**Attorneys for Amici Curiae American Insurance Association and Property Casualty Insurers Association of America:**
White and Steele, PC
John Lebsack
  *Denver, Colorado*

**No appearance by or on behalf of Hernan Hernandez; Alliance Construction & Restoration, Inc.; MDR Roofing, Inc.; and Industrial Claim Appeals Office of the State of Colorado.**

**JUSTICE HOOD** delivered the Opinion of the Court.
**JUSTICE GABRIEL** concurs.
**JUSTICE COATS** dissents, and **CHIEF JUSTICE RICE** and **JUSTICE EID** join in the dissent.

¶1   In this workers' compensation insurance case, we consider whether an insurer had a legal obligation to notify a non-insured holder of a certificate of insurance when the insurance policy evidenced by the certificate was cancelled. Based on the certificate at issue here and the relevant statute, we conclude that the insurer had no such obligation. We therefore reverse the court of appeals' judgment to the contrary.

## I. Facts

¶2   Norma Hoff owns a house that she rents out through a property management agency. When the roof of the house sustained hail damage, Hoff and her husband contracted with Alliance Construction & Restoration, Inc. ("Alliance") to repair it. Without Hoff's knowledge, Alliance subcontracted the roofing job to MDR Roofing, Inc. ("MDR"). MDR employed Hernan Hernandez as a roofer.

¶3   While working on Hoff's roof, Hernandez fell from a ladder and suffered serious injuries. He sought medical and temporary total disability benefits for these work-related injuries, but MDR's insurer, Pinnacol Assurance ("Pinnacol"), denied the claim because MDR's insurance coverage had lapsed. Neither Hoff nor Alliance had workers' compensation insurance. Hernandez then brought an action under the Workers' Compensation Act ("WCA" or "the Act"), §§ 8-40-101 to 8-47-209, 8-55-101 to -105, C.R.S. (2015), seeking benefits against MDR, Alliance, Hoff, and Pinnacol.

¶4   The facts relevant to this claim are best summarized chronologically.

¶5   In July 2010, MDR applied for workers' compensation insurance from Pinnacol through Pinnacol's agent, Bradley Insurance Agency ("Bradley"). Shortly thereafter, Pinnacol issued a policy to MDR.

3

¶6    In October 2010, before starting the roofing job on Hoff's property, Alliance obtained from Bradley a certificate of insurance[1] which verified that MDR had a workers' compensation insurance policy in effect from July 9, 2010, to July 1, 2011.

¶7    On February 10, 2011, Pinnacol informed MDR by certified letter that MDR's insurance policy would be cancelled if Pinnacol did not receive payment of a past-due premium by March 2, 2011. Pinnacol also mailed a copy of this letter to Bradley. Alliance was not notified of the pending cancellation.

¶8    MDR did not pay the past-due premium, and the policy was therefore cancelled effective March 3, 2011. Pinnacol sent letters to MDR and Bradley advising them of the cancellation, but it did not send a letter to Alliance.

¶9    One week later, on March 10, 2011, Hernandez's injuries occurred.

¶10   On March 11, 2011, MDR's owner went to Bradley's office and asked to reinstate the policy. Bradley personnel informed MDR's owner that the policy could be reinstated only if the owner paid the outstanding premium, paid a reinstatement fee, and signed a "no-loss" letter, which is a statement by an insured certifying that no injuries have occurred since the insured's policy was cancelled. MDR's owner made the necessary payments and, although he knew Hernandez had been injured since the policy's cancellation, signed and submitted the no-loss letter. He did not inform Bradley of Hernandez's accident. That same day, upon receiving the payments and

---

[1] This certificate is attached as an appendix ("Appendix") to this opinion. A certificate of insurance is "[a] document acknowledging that an insurance policy has been written, and setting forth in general terms what the policy covers." Certificate of Insurance, Black's Law Dictionary (10th ed. 2014).

no-loss letter, Pinnacol reinstated MDR's policy retroactively to the March 3 cancellation date.

¶11 On March 16, 2011, MDR's owner returned to Bradley's office to report Hernandez's March 10 injuries. Bradley contacted Pinnacol to advise it of the claim. Pinnacol contested the claim on coverage grounds and later cancelled the policy.

## II. Procedural History

¶12 After conducting a hearing on Hernandez's workers' compensation claim, an administrative law judge ("ALJ") determined that Pinnacol's March 3 cancellation of MDR's insurance policy was proper. The ALJ further determined that MDR's owner's failure to disclose Hernandez's injuries when he signed the no-loss letter was a material misrepresentation that rendered void the March 11 reinstatement of the policy. As a result, MDR had no workers' compensation coverage on March 10—the day of Hernandez's injuries—and Pinnacol could not be held liable on the claim.

¶13 The ALJ also concluded that, in addition to MDR, who was Hernandez's direct employer, Hoff and Alliance were Hernandez's statutory employers under sections 8-41-402 and 8-41-401 of the WCA, respectively. Finding that none of these three parties had a workers' compensation insurance policy in effect on March 10, 2011, the ALJ held them jointly liable for Hernandez's benefits.

¶14 On appeal to the Industrial Claim Appeals Office ("ICAO" or "the Panel"), Hoff argued that, under the doctrine of promissory estoppel, Pinnacol should be barred from denying coverage because the certificate of insurance required Pinnacol to notify Alliance that MDR's policy was being cancelled, she and Alliance relied on the

certificate as proof that MDR had insurance, and Pinnacol failed to notify Alliance of the policy's cancellation. The Panel rejected this argument and affirmed the ALJ's order.

¶15 Hoff then appealed the Panel's order to the court of appeals,[2] again asserting a claim of promissory estoppel. In <u>Hoff v. Industrial Claim Appeals Office</u>, 2014 COA 137M, __ P.3d __, a division of the court of appeals reversed, with each of the division's three judges writing separately. Although the division unanimously rejected the Panel's promissory estoppel analysis,[3] <u>id.</u> at ¶¶ 28–30; <u>id.</u> at ¶ 46 (Casebolt, J., concurring in part and dissenting in part); <u>id.</u> at ¶ 69 (Berger, J., concurring in part and dissenting in part), it disagreed as to how the estoppel claim should be resolved.

¶16 The majority (Judges Dailey and Berger) held that the certificate required Pinnacol to notify Alliance if MDR's insurance policy was cancelled and that any contrary disclaimer language[4] in the certificate was void; accordingly, this notice obligation satisfied the "promise" element of Hoff's promissory estoppel claim as a

_____

[2] Neither Alliance nor MDR joined in this appeal or filed an appeal of its own.

[3] The court also was unanimous in determining that Hoff had standing to bring a claim for promissory estoppel. <u>Hoff</u>, ¶¶ 2 & n.1, 14–24. The issue of Hoff's standing is not before us, and we therefore do not address it further.

[4] The following statement appears at the top of the certificate:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT . . . AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE . . . DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

<u>See</u> Appendix. Later, the certificate also states: "THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES." <u>See</u> <u>id.</u>

matter of law. See id. at ¶¶ 2, 31–43 (majority opinion); id. at ¶ 70 (Berger, J., concurring in part and dissenting in part). Judge Casebolt dissented from this holding, instead finding that the certificate was ambiguous and that "the kind and nature of the promises and disclaimers contained in the certificate present[ed] factual issues that the ALJ should first decide" on remand. See id. at ¶ 51 (Casebolt, J., concurring in part and dissenting in part).

¶17    The majority (Judges Dailey and Casebolt) also held, however, that the question of whether the other elements of promissory estoppel were satisfied was a factual issue best resolved by the ALJ in the first instance and that remand was therefore necessary. Id. at ¶¶ 2, 44 (majority opinion); id. at ¶ 46 (Casebolt, J., concurring in part and dissenting in part). Judge Berger dissented from this holding. In his view, the facts relevant to all elements of Hoff's promissory estoppel claim were undisputed, and the court therefore should have resolved the claim as a matter of law. Id. at ¶¶ 68–69 (Berger, J., concurring in part and dissenting in part). Applying the law to the facts, Judge Berger would have held that Pinnacol was estopped from denying coverage for Hernandez's benefits. See id. at ¶¶ 69–76.

¶18    We granted Pinnacol's petition for certiorari.[5]

---

[5] We granted certiorari to review the following issues:

  1. Whether the court of appeals erred in holding, contrary to Broderick Inv. Co. v. Strand Nordstrom, 794 P.2d 264 (Colo. App. 1990), and decisions by the Industrial Claim Appeal Office (ICAO) which follow Broderick, that a certificate of insurance evidencing the issuance of a workers' compensation insurance policy required the insurer to inform the certificate holder of the cancellation of the policy, where the certificate states that notice of cancellation "will be delivered in

7

## III. Analysis

¶19 We begin our analysis by addressing the appropriate standard of review and rejecting Pinnacol's contention that we should defer to the ICAO's interpretation of the WCA. We then turn to Hoff's promissory estoppel claim and, after summarizing the applicable law, examine whether the court of appeals properly determined that the initial, promise element of Hoff's claim was established as a matter of law.

¶20 In doing so, we first consider the court of appeals' determination that the certificate of insurance promised that the insurer, Pinnacol, would notify the certificate holder, Alliance, of policy cancellation. We conclude that the unambiguous language of the certificate contains no such promise.

¶21 Next, we consider the court of appeals' holding that public policy expressed in sections 8-41-402 and 8-41-404 of the WCA required it to construe the certificate as promising notice to Alliance. We conclude that nothing in the WCA supports imposing such a promise either.

¶22 Pinnacol was therefore under no obligation to notify Alliance of policy cancellation. Because Pinnacol did not promise to provide such notice, Hoff's

accordance with the policy provisions," and the policy only requires the insurer to provide notice of cancellation to the policy holder.

2. Whether the court of appeals erred in interpreting section 8-41-404, C.R.S. (2014), to create a public policy mandate that invalidates the "disclaimers and exculpatory language" in a certificate of insurance to require that notice of cancellation of a policy be provided to certificate holders where section 8-44-110, C.R.S. (2014), does not require such notice and the certificate of insurance form containing such language was approved by the commissioner of insurance pursuant to section 8-44-102, C.R.S. (2013).

promissory estoppel claim fails for lack of a necessary element. Accordingly, we reverse the judgment of the court of appeals.

## A. Standard of Review

¶23 Pinnacol argues the court of appeals erred in not deferring to the ICAO's interpretation of the WCA. Because the ICAO has not rendered a decision addressing the precise issues before us here, we disagree that deference is owed.

¶24 Judicial review of the Panel's disposition of a workers' compensation claim is governed by the WCA. See Fulton v. King Soopers, 823 P.2d 709, 712–13 (Colo. 1992). Section 8-43-307 allows dissatisfied parties to appeal a Panel order to the court of appeals, see § 8-43-307(1), and several subsequent sections circumscribe the nature and scope of that court's review, see §§ 8-43-308 to -310. Section 8-43-313, in turn, allows a still-dissatisfied party to seek review of the court of appeals' decision in this court. If we grant review, our inquiry is limited "to a summary review of questions of law." § 8-43-313. In evaluating a Panel order under these provisions, appellate courts defer to the agency's factual findings but review its conclusions of law de novo. See City of Brighton v. Rodriguez, 2014 CO 7, ¶¶ 11–12, 318 P.3d 496, 501; Kieckhafer v. Indus. Claim Appeals Office, 2012 COA 124, ¶¶ 8, 12, 284 P.3d 202, 205–06.

¶25 So, the presumptive standard of review is de novo for the questions of law central to this case—i.e., the proper construction of the certificate, the insurance policy, and certain provisions of the WCA. See Specialty Rests. Corp. v. Nelson, 231 P.3d 393, 397 (Colo. 2010) ("Statutory construction is a question of law . . . ."); Meier v. Denver

9

U.S. Nat'l Bank, 431 P.2d 1019, 1021 (Colo. 1967) ("The construction of a written instrument [is] a question of law . . . .").

¶26 But, as Pinnacol points out, this typically unfettered review is sometimes restricted when it comes to interpreting provisions of the WCA. Although appellate courts ultimately are not bound by the Panel's legal interpretations, see Rodriguez, ¶ 12, 318 P.3d at 501, or by its earlier decisions, Kieckhafer, ¶ 8, 284 P.3d at 205, courts nonetheless traditionally give deference to the Panel's reasonable interpretations of WCA provisions, see Specialty Rests., 231 P.3d at 397; Kieckhafer, ¶ 8, 284 P.3d at 205.

¶27 Pinnacol seizes on this deference principle, claiming that the court of appeals' prior decision in Broderick Investment Co. v. Strand Nordstrom Stailey Parker, Inc., 794 P.2d 264, 266 (Colo. App. 1990), set forth a rule that certificates of insurance create no rights for a certificate holder and that, although Broderick did not involve workers' compensation, the ICAO has long applied this rule in the workers' compensation context. As support, Pinnacol cites four prior ICAO decisions, in addition to the Panel's decision here, and asserts these decisions "implicitly interpret the Act as not creating any contractual duty for the benefit of a certificate holder where, as here, the certificate is specifically limited to an informational document only which is subject to the terms of the policy." Accordingly, Pinnacol argues the ICAO has interpreted the WCA as not requiring notice to certificate holders, and the court of appeals erred in failing to accord deference to this interpretation.

¶28 None of these ICAO decisions, however, interpreted the statutory provisions on which the court of appeals relied in this case. The ICAO did not examine whether

10

public policy underlying sections 8-41-402 and 8-41-404 of the WCA required insurers to notify certificate holders about policy cancellations and rendered void any disclaimers that would prevent certificates from serving their intended purpose under the Act.

¶29 In fact, three of the four prior decisions, as well as the decision below, merely applied Broderick as controlling precedent without tying that case or its purported rule to any WCA provision at all. See Hernandez v. MDR Roofing, Inc., W.C. No. 4-850-627-03, 2013 WL 858028, at *4 (Colo. ICAO Feb. 27, 2013); Lopez-Najera v. Black Roofing, Inc., W.C. No. 4-565-863, 2004 WL 2107582, at *3 (Colo. ICAO Sept. 13, 2004); Gomez v. Gonzales, W.C. Nos. 4-447-171 & 4-449-330, 2004 WL 348737, at *8 (Colo. ICAO Feb. 18, 2004); Wilson v. H & S Constr., W.C. No. 4-472-849, 2002 WL 2018806, at *3 (Colo. ICAO Aug. 30, 2002). And the other prior decision squared Broderick with a statutory provision extraneous to the court of appeals' analysis here. See Suttles v. Sherman, W.C. No. 4-308-510, 1997 WL 730627, at *4–6 (Colo. ICAO Oct. 31, 1997) (citing § 8-45-112, C.R.S. (1997)). It neither interpreted sections 8-41-402 and 8-41-404 nor considered what those provisions require of insurers vis-à-vis certificate holders. Id.

¶30 Thus, Pinnacol's argument suffers from the false premise that the ICAO has rendered an interpretation of the WCA provisions central to the case at hand. In other words, there is no interpretation to which we or the court of appeals could defer. We therefore apply traditional de novo review.

11

## B. Promissory Estoppel Does Not Apply Because There Was No Promise

¶31 We now turn to Hoff's claim that Pinnacol is estopped from denying coverage for Hernandez's workers' compensation benefits. In order to place the issues on which we granted certiorari in context, we first briefly summarize the law of promissory estoppel. We then consider whether there is a promise here, based on the certificate of insurance or the WCA. We conclude there is not.

### 1. Promissory Estoppel Generally

¶32 Promissory estoppel is a quasi-contractual cause of action that, under certain circumstances, provides a remedy for a party who relied on a promise made by another party, even though the promise was not contained in an enforceable contract. See Wheat Ridge Urban Renewal Auth. v. Cornerstone Grp. XXII, L.L.C., 176 P.3d 737, 741 (Colo. 2007). A claim for promissory estoppel consists of four elements: (1) a promise; (2) that the promisor reasonably should have expected would induce action or forbearance by the promisee or a third party; (3) on which the promisee or third party reasonably and detrimentally relied; and (4) that must be enforced in order to prevent injustice. See, e.g., Cherokee Metro. Dist. v. Simpson, 148 P.3d 142, 151 (Colo. 2006). Where these elements are present, a promise becomes binding and may be enforced through the normal remedies available under contract law. Bd. of Cty. Comm'rs v. DeLozier, 917 P.2d 714, 716 (Colo. 1996).

¶33 Here, the court of appeals concluded that Hoff qualified as a third party beneficiary of the alleged promise made to Alliance and thus could bring a claim based

12

on that alleged promise. <u>Hoff</u>, ¶¶ 2 & n.1, 22–24. The court also concluded that, although Bradley issued the certificate, Bradley was acting as Pinnacol's agent when it did so and therefore was an entity legally indistinguishable from Pinnacol for purposes of analyzing Hoff's claim. <u>See id.</u> at ¶¶ 29 & n.5, 38 n.6. Pinnacol does not challenge these conclusions, and we accept them as true for purposes of this appeal.

¶34 In addition, the court of appeals majority declined to decide whether Hoff had established all the elements of a claim for promissory estoppel. <u>Id.</u> at ¶¶ 2, 44. Rather, as to all but the promise element, the majority determined that factual issues remained and therefore remanded the case to the ALJ to address those issues in the first instance. <u>See id.</u> at ¶¶ 2 & nn.2–3, 44. Pinnacol does not challenge this remand decision either. Instead, Pinnacol focuses only on the court's disposition of the promise element.

¶35 The question for us, then, is whether the court of appeals properly determined that the promise element of Hoff's claim was satisfied as a matter of law. We turn to that question now.

## 2. Application

¶36 Based on both the language of the certificate's cancellation provision and perceived public policy underlying certain provisions of the WCA, the majority below construed the certificate as promising that Pinnacol would notify Alliance if MDR's workers' compensation policy was cancelled. <u>See id.</u> at ¶¶ 2, 31–43. The majority also concluded that the same public policy considerations voided the certificate's disclaimers. <u>See id.</u> at ¶¶ 31, 39–43.

13

¶37 We disagree. Considering each of the majority's dual rationales in turn, we conclude that Pinnacol was under no obligation to notify Alliance of policy cancellation. We also find it unnecessary to address the validity of the certificate's disclaimers.[6] Even assuming that, despite the disclaimers, the certificate could have contained enforceable promises, we still would conclude that a promise to give notice of policy cancellation to Alliance was not one of them. It follows that, regardless of the disclaimers' validity, Hoff's promissory estoppel claim fails for lack of a promise.

### a. Nothing in the Language of the Certificate Promised Notice to Alliance

¶38 The certificate's notice provision is unambiguous, and it did not promise notice to Alliance.

¶39 In construing a document, we look to its terms and apply them as written unless they are ambiguous. See USI Props. E., Inc. v. Simpson, 938 P.2d 168, 173 (Colo. 1997). To determine whether an ambiguity exists, we ask whether the document's plain

---

[6] As a result, we need not consider the broader issue of the legal status of certificates of insurance that contain such disclaimers, or the parties' related contentions concerning Broderick, 794 P.2d 264. We note that courts in other jurisdictions have reached divergent conclusions on the question of whether—and if so, under what circumstances—such certificates can give rise to legal rights, compare, e.g., Criterion Leasing Grp. v. Gulf Coast Plastering & Drywall, 582 So.2d 799, 800–01 (Fla. Dist. Ct. App. 1991) (per curiam) (certificate gave rise to legal rights), Bucon, Inc. v. Pa. Mfg. Ass'n Ins. Co., 547 N.Y.S.2d 925, 927 (N.Y. App. Div. 1989) (same), and Marlin v. Wetzel Cty. Bd. of Educ., 569 S.E.2d 462, 469–73 (W. Va. 2002) (same), with T.H.E. Ins. Co. v. City of Alton, 227 F.3d 802, 805–06 (7th Cir. 2000) (certificate did not give rise to legal rights), W. Am. Ins. Co. v. Meridian Mut. Ins. Co., 583 N.W.2d 548, 550–51 (Mich. Ct. App. 1998) (per curiam) (same), and Bradley Real Estate Tr. v. Plummer & Rowe Ins. Agency, Inc., 609 A.2d 1233, 1234–35 (N.H. 1992) (same), and that Broderick belongs to the latter camp, see 794 P.2d at 265–67. We have not yet weighed in on this larger question, and because this case does not require it, we decline to do so today.

language "is reasonably susceptible on its face to more than one interpretation." <u>See</u> <u>Allen v. Pacheco</u>, 71 P.3d 375, 378 (Colo. 2003). If the document is unambiguous, we will "neither rewrite [it] nor limit its effect by a strained construction." <u>Id.</u>

¶40 The certificate here lists MDR as the "insured" and Pinnacol as an "insurer affording coverage." <u>See</u> Appendix. Below this information, and within a box entitled "coverages," the certificate lists two types of insurance policies: "general liability" and "workers compensation and employers liability." <u>Id.</u> Several details, such as the policy number and dates of coverage, are included for each of the policies. <u>Id.</u> Further below still, and within a box entitled "certificate holder," the certificate lists Alliance. <u>Id.</u> Finally, in a separate, adjacent box entitled "cancellation," the certificate includes the statement central to this case:

> SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

<u>Id.</u>

¶41 We conclude this language is reasonably subject to only one interpretation and is therefore unambiguous. In its first clause, the provision refers to the cancellation of "ANY OF THE ABOVE DESCRIBED POLICIES." This language clearly refers to the general liability and workers' compensation liability policies referenced within the "coverages" box on the certificate. In its second clause, the provision states that, if one of those policies is cancelled, "NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS." Beginning at the end, "the policy," when read

15

together with the first clause, refers to whichever of the two above-referenced policies has been cancelled, and "provisions" refers to the provisions of that policy.

¶42 This leaves us with the word "notice." Again, we find no ambiguity. Aside from specifying that policy cancellation is the event for which notice will be given, the language of the cancellation provision leaves the word "notice" unqualified. Thus, while we agree with the majority's observation that "[t]he cancellation provision does not specify to whom notice of cancellation must be given by Pinnacol," Hoff, ¶ 35, we conclude that the parties consigned the entire question of notice, including to whom it must be given, to the provisions of the policy being cancelled.

¶43 Unlike the court of appeals, we do not believe that, "because Pinnacol was already required, by the terms of the policy, to give notice of termination to MDR," our construction fails to "give reasonable meaning to . . . the certificate." See id. at ¶ 37. This reasoning simply begs the question: to conclude that the certificate duplicates a notice obligation contained in the policy, one must necessarily assume that the certificate imposes a notice obligation that exists independent of the policy to begin with. We reject the premise and thus reject the conclusion. Likewise, we discern no tacit meaning from the proximity of the box identifying Alliance as the certificate holder to the box containing the cancellation provision.

¶44 Looking to the two "above described" policies available, the one whose cancellation is at issue in this case is MDR's workers' compensation policy. The relevant provisions of that policy, in turn, oblige Pinnacol to give notice of cancellation to MDR and stipulate that such notice must comply with certain timing and delivery

16

specifications. Nothing in these provisions states that notice will be provided to anyone other than MDR.

¶45 Because the plain language of the certificate promises only that notice will be delivered in accordance with the provisions of MDR's insurance policy, and because the provisions of that policy contain no promise to give notice to certificate holders, we conclude that Pinnacol was under no contractual obligation to notify Alliance when it cancelled MDR's policy.

¶46 We next consider whether, as the court of appeals majority determined, the WCA requires us to impose such an obligation anyway.

### b. Nothing in the WCA Requires Insurers to Provide Notice of Policy Cancellation to Certificate Holders

¶47 No provision or public policy contained in the WCA required Pinnacol to notify Alliance if MDR's insurance policy was cancelled.

¶48 Our primary task in construing a statute is to effectuate the intent and purpose of the legislature. See Pulsifer v. Pueblo Prof'l Contractors, Inc., 161 P.3d 656, 658 (Colo. 2007). "We determine legislative intent primarily from the plain language of the statute." Id. We also look to statutory language to determine whether public policy affects our construction of an insurance provision. See Bailey v. Lincoln Gen. Ins. Co., 255 P.3d 1039, 1045 (Colo. 2011); see also Rocky Mountain Hosp. & Med. Serv. v. Mariani, 916 P.2d 519, 525 (Colo. 1996) ("Statutes by their nature are the most reasonable and common sources for defining public policy."). In interpreting the WCA, we construe its language "so as to give effect and meaning to all its parts." Pulsifer,

161 P.3d at 658. If the statutory language is clear, we apply it as written. See Specialty Rests., 231 P.3d at 397. We construe the legislature's failure to include particular language not as an oversight, but as a deliberate omission reflecting legislative intent. See id.

¶49 Applying these principles here, we note first that no WCA provision expressly requires that an insurer provide notice to certificate holders when the underlying insurance policy is cancelled. The only WCA provision that addresses notice of cancellation—section 8-44-110—states that a carrier of workers' compensation insurance "shall notify any employer insured by the carrier . . . and any agent or representative of such employer, if applicable, by certified mail of any cancellation of such employer's insurance coverage." § 8-44-110. The provision does not mention certificates of insurance or certificate holders. Id.

¶50 The ALJ determined, the Panel agreed, and Hoff essentially concedes that the terms of section 8-44-110 required only that Pinnacol notify MDR and Bradley when it cancelled MDR's policy, and that Pinnacol did so. Hoff does not contend that Alliance was an "employer insured by the carrier," and for good reason. Even if the term "employer" as used in section 8-44-110 included statutory employers like Alliance, neither applicable law nor the certificate rendered Alliance an "insured" for purposes of that section: Alliance never contracted with Pinnacol for insurance coverage, and neither Hoff nor the court of appeals goes so far as to assert that the certificate itself amounted to an insurance policy or contract of insurance. Cf. Certificate of Insurance,

18

Black's Law Dictionary (10th ed. 2014) (stating that a certificate of insurance is "a document acknowledging that an insurance policy has been written").

¶51 Nonetheless, the majority below looked to other provisions of the WCA—namely, sections 8-41-402 and 8-41-404—and concluded based on these provisions that, "by legislative mandate, certificates of insurance play a critical role in the workers' compensation system" and that this role "would be wholly undermined if . . . notices of termination need not be provided to certificate holders." Hoff, ¶ 40. Consequently, the majority reasoned that "Colorado's public policy, as described in the Act, requires that courts give effect to the reasonable meaning and purpose of certificates," which, to the majority, meant that it "must . . . construe the certificate as requiring notice to the certificate holder of termination of coverage." Id. at ¶ 41.

¶52 We respectfully disagree. Examining sections 8-41-402 and 8-41-404 in the context of the WCA's insurance and liability scheme, we find nothing that warrants imposing the notice requirement that the court of appeals imposed here. A brief journey through these provisions bears this out.

¶53 The "comprehensive insurance scheme" set forth in the WCA is designed to protect injured workers by ensuring the quick and efficient payment of benefits. See Kelly v. Mile Hi Single Ply, Inc., 890 P.2d 1161, 1163 (Colo. 1995); see also § 8-40-102(1). To that end, any "employer" subject to the Act must "secure compensation for all employees" by maintaining workers' compensation insurance. § 8-44-101(1)(a)–(d). The WCA embraces a broad conception of the term "employer," see Finlay v. Storage Tech. Corp., 764 P.2d 62, 64 (Colo. 1988); see also § 8-40-203 (defining "employer"), and

19

"contains several provisions rendering certain entities who are not 'direct' employers of injured persons 'statutory employers' within the meaning of the Act," Krol v. CF&I Steel, 2013 COA 32, ¶ 25, 307 P.3d 1116, 1121.

¶54 Section 8-41-402 is one of these provisions. Section 8-41-402 governs repairs to real property and states that every owner of real property who contracts out work done on that property to "any contractor, subcontractor, or person who hires or uses employees in the doing of such work shall be deemed to be an employer under the [WCA]." § 8-41-402(1). Hoff is Hernandez's statutory employer under this provision.

¶55 Section 8-41-402(1) further provides that such owner-employers "shall be liable" for workers' compensation claims resulting from work-related injuries on their property and "shall insure and keep insured all liability" for workers' compensation imposed under the Act. Id. To offset this financial responsibility, subsection (1) gives such owner-employers the affirmative right to recover the cost of workers' compensation insurance from the "contractor, subcontractor, or person" that they hire. Id.[7]

¶56 But, as the majority recognized, see Hoff, ¶ 40, section 8-41-402(2) imposes a conditional limitation on such owner-employers' obligation to pay compensation benefits. Specifically, it provides that, if the "contractor, subcontractor, or person doing

[7] It is worth noting that this subsection also says the WCA does not apply to "the owner or occupant, or both, of residential real property which meets the definition of a 'qualified residence' under [the Internal Revenue Code], who contracts out any work done to the property . . . ." § 8-41-402(1). The applicable section of the Code, in turn, defines "qualified residence" as including a taxpayer's principal residence. See 26 U.S.C. § 163(h)(4)(A)(i)(I) (2012). Thus, the qualified-residence exception effectively shields an ordinary homeowner from workers' compensation liability arising from work done to the home in which he or she lives. This exception does not apply here because Hoff uses the house where Hernandez's injuries occurred as a rental property.

or undertaking to do any work for an [owner-employer] . . . <u>is also an employer</u> in the doing of such work <u>and</u> . . . <u>insures and keeps insured all liability for compensation</u>," then "neither said contractor, subcontractor, or person nor any employees or insurers thereof shall have any right of contribution or action of any kind" against the owner-employer. § 8-41-402(2) (emphases added).

¶57 Separately, section 8-41-404 addresses workers' compensation insurance in the specific context of construction work. Section 8-41-404 states in part that "a person who contracts for the performance of construction work on a construction site shall <u>either</u> provide . . . workers' compensation coverage for, <u>or require proof of workers' compensation coverage from</u>, every person with whom he or she has a direct contract to perform construction work on the construction site." § 8-41-404(1)(a) (emphases added). Hoff is "a person who contracts for the performance of construction work on a construction site" for purposes of this provision. <u>See</u> § 8-41-404(5)(a)–(b) (providing broad definitions of "construction site," in paragraph (a), and "construction work," in paragraph (b), that encompass the roofing work done at Hoff's rental house).[8] Critical to the majority's decision here, the provision defines "proof of workers' compensation coverage" as including a certificate of insurance. <u>See</u> § 8-41-404(5)(c).

---

[8] Like section 8-41-402, section 8-41-404 includes a "qualified residence" exception and therefore does not apply to a homeowner contracting to have work done to the home in which he or she lives. <u>See</u> § 8-41-404(1)(a), (4)(a)(I). But, as noted above, Hoff does not qualify for this exception. Moreover, section 8-41-404 also does not apply to an owner of real property who hires someone "specifically to do routine repair and maintenance" on that property. § 8-41-404(4)(a)(II). Here, the ALJ found that this exception does not apply to Hoff because the roof repair job was not "routine." Hoff does not challenge this determination, and we therefore accept it for purposes of this appeal.

¶58    Unlike section 8-41-402, section 8-41-404 does not render the persons to whom it applies statutory employers or impose liability for injured workers' benefits. Compare § 8-41-402(1), with § 8-41-404. Rather, persons who fail to provide or obtain proof of insurance as required by section 8-41-404 may be subjected to the administrative fine provisions of section 8-43-409(1)(b) of the WCA. See § 8-41-404(3) ("A violation of subsection (1) of this section is punishable by an administrative fine imposed pursuant to section 8-43-409(1)(b).").[9]

¶59    Reading sections 8-41-402 and 8-41-404 together, the majority below determined that "the Act specifically recognizes certificates of insurance as a mechanism to protect an owner from precisely the types of liabilities [i.e., liability for workers' compensation benefits] imposed on Hoff in this case." Hoff, ¶ 42 (citing §§ 8-41-402, 8-41-404(5)(c)). But we see nothing in the Act that supports this statement.

¶60    Sections 8-41-402 and 8-41-404, though related, impose separate and distinct liabilities: the former imposes liability for workers' compensation benefits, § 8-41-402(1), and the latter imposes liability for administrative fines, § 8-41-404(3). It is only within the framework of section 8-41-404, however, that the legislature has carved out a role for certificates of insurance. As noted above, section 8-41-404 requires that the persons to whom it applies either provide, or obtain proof of, workers' compensation insurance, see § 8-41-404(1)(a), and specifies that a certificate qualifies as such proof, see

_____

[9] Section 8-43-409(1)(b) imposes fines of either a maximum of $250, for an initial violation, or a minimum of $250 and a maximum of $500, for any subsequent violation, "[f]or every day that the employer fails or has failed to insure or to keep the insurance required by [the WCA]." See § 8-43-409(1)(b)(I)–(II).

22

§ 8-41-404(5)(c). It then immunizes persons who obtain proof of insurance from liability under its administrative fine provision. See § 8-41-404(1)(c).

¶61    By contrast, section 8-41-402 does not mention certificates or any other proof of insurance. Unlike section 8-41-404, section 8-41-402 does not offer the entities to which it applies the option of obtaining proof of insurance in lieu of supplying insurance. See § 8-41-402(1). Nor does it provide any safe harbor equivalent to section 8-41-404(1)(c). See § 8-41-402. Although it does immunize an owner-employer from contribution and other lawsuits when the entity it employs is insured "and keeps insured," § 8-41-402(2) (emphasis added), nothing in the statute indicates that this other insurance negates the owner-employer's independent obligation to secure insurance for itself or that any proof of this other insurance can insulate the owner-employer from liability in the event the other insurance lapses, see § 8-41-402.[10]

---

[10] Although this interpretation could, in theory, lead some owner-employers to conclude that their safest bet would be to secure workers' compensation insurance of their own, we do not see such a result as inevitable. For example, an owner-employer might instead choose to be more proactive in verifying that the coverage identified in a certificate remains in effect on the date work is to be performed. This the owner-employer can do with no trouble at all: at the legislature's behest, the Division of Workers' Compensation has created a searchable online database through which anyone can confirm that a given employer has insurance in effect on the date the search is conducted. See Colo. Dep't of Labor & Emp't, Insurance Coverage, https://perma.cc/6FUK-RK22; see also § 8-47-111(2) ("[T]he division shall develop a procedure for verifying whether or not all employers doing business in . . . Colorado comply with the [insurance] requirements of [the WCA]."). And even where an owner-employer opts to acquire insurance, section 8-41-402 expressly allows it to recover the cost of that insurance from the entity it hires. See § 8-41-402(1). Moreover, to the extent there may be circumstances in which both the owner-employer and its hired entity obtain insurance, we note that this consequence fully comports with the fundamental goal of the WCA: "to assure the quick and efficient delivery of . . . benefits to injured workers at a reasonable cost to employers, without the necessity of any

23

¶62 Thus, contrary to the court of appeals' conclusion, nothing in section 8-41-402 or section 8-41-404 states, or even suggests, that the legislature intended for certificates of insurance to shield owner-employers from liability for workers' compensation benefits. Because the clear language of these provisions, including the absence, in section 8-41-402, of <u>any</u> exception to an owner-employer's statutory obligations, refutes the majority's interpretation of them, we reject that interpretation. <u>See</u> <u>Specialty Rests.</u>, 231 P.3d at 397.

¶63 Moreover, the role certificates play within section 8-41-404 is not undermined if insurers of the policies evidenced by the certificates do not notify certificate holders in the event those policies are cancelled. Section 8-41-404(1)(c) provides that, if a person who must secure or require proof of workers' compensation insurance under section 8-41-404(1)(a) "exercises due diligence by . . . requiring proof of workers' compensation insurance as required by this section," then that person "shall not be liable" for the administrative fines imposed under section 8-41-404(3). § 8-41-404(1)(c). By its terms, this safe-harbor provision requires only that a person exercise due diligence by obtaining a certificate. <u>See</u> <u>id.</u> Nothing in the provision ties the availability of its

---

litigation." § 8-40-102(1). Not only does encouraging both statutory and direct employers to maintain coverage more adequately protect injured workers, it also ensures that those employers receive the primary benefit that the WCA is designed to give them—namely, immunity from common-law tort liability. <u>See</u> <u>Curtiss v. GSX Corp. of Colo.</u>, 774 P.2d 873, 874–75 (Colo. 1989). Indeed, the legislature has expressly declared its belief that "it is in the best interests of the public to assure that <u>all</u> <u>employers</u> who fall under the provisions of [the WCA] have in effect current policies of insurance or self-insurance for workers' compensation liability." § 8-47-111(1) (emphasis added).

protections to the continued validity of the insurance policy underlying that certificate. Id.

¶64 In sum, we disagree with the majority below regarding the role certificates play under the WCA and find no support for its conclusion that "Colorado's public policy, as described in the Act," required it to construe the certificate here as mandating notice of policy cancellation to the certificate holder. Because no provision of the Act expressly imposes this requirement either, we conclude that the WCA did not require Pinnacol to notify Alliance when it cancelled MDR's policy.

¶65 Requiring notice to all certificate holders may be sensible, but it is not our place to legislate what we perceive as a more sensible result. We cannot simply rewrite the statute. See Dove Valley Bus. Park Assocs., Ltd. v. Bd. of Cty. Comm'rs, 945 P.2d 395, 403 (Colo. 1997).

* * *

¶66 Pinnacol was under no obligation to notify Alliance in the event MDR's workers' compensation insurance policy was cancelled. Because Pinnacol did not promise to provide notice, Hoff cannot establish the initial, promise element of her promissory estoppel claim, and her claim must fail. The court of appeals erred in concluding otherwise.

## IV. Conclusion

¶67 Neither the terms of the certificate of insurance nor any provision or public policy contained in the WCA required Pinnacol to notify Alliance in the event MDR's insurance policy was cancelled. Pinnacol therefore did not "promise" to provide such

25

notice, and Hoff's claim for promissory estoppel must fail for lack of the requisite promise element. For these reasons, we reverse the judgment of the court of appeals.

**JUSTICE GABRIEL** concurs.
**JUSTICE COATS** dissents, and **CHIEF JUSTICE RICE** and **JUSTICE EID** join in the dissent.

CERTIFICATE OF LIABILITY INSURANCE

DATE FILED: January 29, 2015 2:31 PM

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

PRODUCER
Bradley Insurance Group.
3401 W. 38th Avenue
Denver, CO 80211
Christopher J. DiDonato

303-480-3000
303-458-6657

INSURED
KDR Roofing Inc.
8250 N. Federal Blvd. Lot J
Denver, CO 80221

INSURER(S) AFFORDING COVERAGE

| | INSURER | NAIC # |
|---|---|---|
| INSURER A | Atlanta Casualty Company | |
| INSURER B | Pinnacol Assurance | 41190 |
| INSURER C | | |
| INSURER D | | |
| INSURER E | | |
| INSURER F | | |

COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFF | POLICY EXP | LIMITS | |
|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY | C240031668 | 02/25/10 | 02/25/11 | EACH OCCURRENCE | $1,000,000 |
| | X COMMERCIAL GENERAL LIABILITY | | | | DAMAGE TO RENTED PREMISES | $100,000 |
| | CLAIMS-MADE  X  OCCUR | | | | MED EXP | $5,000 |
| | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | GENERAL AGGREGATE | $2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | POLICY  PROJECT  LOC | | | | | |
| | AUTOMOBILE LIABILITY | | | | COMBINED SINGLE LIMIT | |
| | ANY AUTO | | | | BODILY INJURY (Per person) | |
| | ALL OWNED AUTOS | | | | BODILY INJURY (Per accident) | |
| | SCHEDULED AUTOS | | | | PROPERTY DAMAGE | |
| | HIRED AUTOS | | | | | |
| | NON-OWNED AUTOS | | | | | |
| | UMBRELLA LIAB  OCCUR | | | | EACH OCCURRENCE | |
| | EXCESS LIAB  CLAIMS-MADE | | | | AGGREGATE | |
| | DEDUCTIBLE | | | | | |
| | RETENTION $ | | | | | |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | 4141198 | 07/25/10 | 07/01/11 | WC STATU-TORY LIMITS  OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | | | | E.L. EACH ACCIDENT | $100,000 |
| | (Mandatory in NH) | | | | E.L. DISEASE - EA EMPLOYEE | $100,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | E.L. DISEASE - POLICY LIMIT | $500,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

CERTIFICATE HOLDER

Alliance Construction
1529 Market St., Ste 202
Denver, CO 80202

CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

AUTHORIZED REPRESENTATIVE

© 1988-2009 ACORD CORPORATION. All rights reserved.

ACORD 25 (2009/09)    The ACORD name and logo are registered marks of ACORD

EXHIBIT

JUSTICE GABRIEL, concurring.

¶68 Because I believe that the majority has correctly set forth the applicable law and has reached the result dictated by that law, I concur in the majority's opinion. I write separately, however, to express my view that the result that I believe the law dictates here is arguably inequitable and warrants legislative action to clarify the purpose and effect of a certificate of insurance, as well as the rights and obligations of those who provide and those who obtain such certificates.

## I. Applicable Statutes

¶69 Like the majority, see maj. op. ¶¶ 47–64, I cannot say that the applicable statutes impose a duty on insurers to give notice of a policy's cancellation to certificate holders.

¶70 Section 8-44-110, C.R.S. (2015), requires every insurance carrier authorized to transact business in Colorado, including Pinnacol Assurance, to notify "any employer insured by the carrier or Pinnacol Assurance, and any agent or representative of such employer, if applicable, by certified mail of any cancellation of such employer's insurance coverage." I see nothing in the applicable definitions of "employer" to suggest to me that the term "employer" as used in this section includes a statutory employer like Hoff here. See § 8-40-203, C.R.S. (2015) (defining the term "employer" for purposes of the Workers' Compensation Act (the "Act")); see also § 8-40-302, C.R.S. (2015) (delineating the scope of the term "employer" under the Act).

¶71 Even if the term "employer" as used in section 8-44-110 did include statutory employers, however, neither applicable law nor the certificate of insurance at issue renders such an employer an "insured" for purposes of that section. The certificate of

1

insurance is not itself an insurance policy or contract of insurance. Rather, it is "[a] document acknowledging that an insurance policy has been written, and setting forth in general terms what the policy covers." Certificate of Insurance, Black's Law Dictionary (10th ed. 2014).

¶72 Accordingly, in my view, the applicable statutes did not require that notice of cancellation be provided to the certificate holder in this case.

¶73 I am not persuaded otherwise by section 8-41-404, C.R.S. (2015). Subject to certain exceptions not pertinent here, section 8-41-404(1)(a) requires a person who contracts for the performance of construction work on a construction site either to provide workers' compensation coverage for, or to require proof of workers' compensation coverage from, every person with whom he or she has directly contracted to perform the construction work. Section 8-41-404(1)(c) then provides that any person who contracts for the performance of such work and who exercises due diligence by either providing workers' compensation coverage or requiring proof of such coverage from every person with whom he or she has a direct contract "shall not be liable under subsection (3) of this section." Section 8-41-404(3), in turn, provides for an administrative fine for violating subsection (1).

¶74 I see nothing in section 8-41-404 that renders a certificate holder an insured for purposes of the Act generally or section 8-44-110 in particular. To the contrary, section 8-41-404, on its face, makes clear that a certificate constitutes proof that someone else has obtained workers' compensation coverage.

¶75    Notwithstanding the foregoing, I acknowledge that section 8-41-404 suggests the importance of certificates of insurance in this context, particularly given that those who contract for the performance of construction work often rely on such certificates and on the insurance coverage reflected thereon. As a result, it may well be sound public policy to require insurers to provide notice of an insurance policy's cancellation to those holding certificates of insurance concerning the subject insurance policy. Such a public policy decision, however, is for the legislature and not the courts to make.

¶76    Accordingly, I would respectfully encourage our General Assembly to consider the public policies implicated by this case, particularly with respect to the purpose and effect of a certificate of insurance and the rights and obligations of those who provide and those who obtain such certificates.

## II. Certificate of Insurance

¶77    Having determined that the applicable statutes did not require that notice of cancellation be provided to the certificate holder in this case, I must next consider whether the certificate itself required such notice. This question, in turn, requires me to assess first whether the disclaimers and exculpatory language contained in the certificate are void as against public policy and second whether the certificate is ambiguous.

¶78    The certificate at issue contains a disclaimer that states:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF

3

INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S)' AUTHORIZED REPRESENTATIVE OR PRODUCER AND THE CERTIFICATE HOLDER.

¶79 The certificate further states, "NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES."

¶80 Because I perceive nothing in the applicable statutes that imposes a duty on insurers to give notice of a policy's cancellation to certificate holders, I cannot say that those statutes render the above-quoted provisions, which merely explain the limits of the certificate, void as against public policy. Accordingly, I proceed to address whether the certificate at issue is ambiguous.

¶81 Whether a written contract is ambiguous is a question of law that we review de novo. Pub. Serv. Co. v. Meadow Island Ditch Co., 132 P.3d 333, 339 (Colo. 2006). "A contract is ambiguous when it is reasonably susceptible to more than one meaning." Id.

¶82 To determine whether a contractual provision is ambiguous, we examine the provision's language and construe that language in harmony with the plain and generally accepted meaning of the words employed. Ad Two, Inc. v. City & Cty. of Denver, 9 P.3d 373, 376 (Colo. 2000). We may also consider "extrinsic evidence regarding the meaning of the written terms, including evidence of local usage and of the circumstances surrounding the making of the contract," but in determining whether

4

a contract term is ambiguous, we may not consider "the parties' extrinsic expressions of intent." Pub. Serv. Co., 132 P.3d at 339.

¶83 Here, Hoff contends that the certificate is ambiguous because the language concerning the notice of cancellation is encompassed in a box including the identity of the certificate holder. She argues that the clear import of the location and language of the notice provision is that it is a message to the certificate holder directly. Her argument may be correct insofar as it goes, but it does not establish any ambiguity as to whether and when notice to the certificate holder is required, which is the issue before us.

¶84 Specifically, although I agree with Hoff that the juxtaposition of the identity of the certificate holder with the notice provision suggests that the notice referred to is notice due the certificate holder, nothing in the juxtaposition of these provisions suggests to me that notice must always be given to the certificate holder. To the contrary, the notice provision states that notice will be delivered "in accordance with the policy provisions," and Hoff does not suggest any ambiguity as to the meaning of that phrase.

¶85 Accordingly, Hoff has not established that the certificate at issue is ambiguous.

### III. Conclusion

¶86 For these reasons, I respectfully concur in the majority's opinion and the judgment of the court.

5

JUSTICE COATS, dissenting.

¶87 Because I disagree with the majority's construction of the controlling statutes and would, instead, largely affirm the judgment of the court of appeals, I respectfully dissent. Quite apart from the outcome of this particular case, however, I fear that the majority's myopic, and at various points in the analysis questionable, construction is likely to have unintended, and substantially deleterious, consequences for the protection of both workers and employers. I write separately, therefore, to identify what I consider to be the central flaw in the majority's reasoning and to emphasize the magnitude of its departure from the underlying philosophy of the workers' compensation scheme.

¶88 Unlike the majority, I believe the court of appeals was entirely correct in its assessment that "[t]he Act expressly contemplates that a person or entity in the chain of contract or work on a construction contract may obtain a certificate of workers' compensation insurance to protect itself from the types of liabilities at issue here." However, unlike the court of appeals, which clearly considered its hands tied by our half-century-old opinion in Chevron Oil Co. v. Industrial Commission, 456 P.2d 735 (Colo. 1969), and the structuring of Hoff's assignment of error to circumvent its subsequent interpretation by other panels of that court, and therefore felt compelled to articulate its holding in a roundabout way, in terms of a combination of promissory estoppel principles and the public policy expressed in the Act, I believe this court should cut through the circuity and simply hold that the certificate issued by Pinnacol made Alliance an insured employer within the contemplation of section 8-44-110, C.R.S.

1

(2015), and that Pinnacol's failure to provide notice to Alliance as required by that statute therefore resulted in Pinnacol's continued coverage of the injured worker. I think it a relatively straightforward task to distinguish Chevron, which concerned a dispute among three different insurance companies over which would be liable to compensate for a worker's death and, as relevant here, merely stood for two peripheral propositions: first, that an administrative rule of the Industrial Commission could not modify the statutory scheme by adding a requirement to give prior notice of a cancellation to the Commission itself, and second, that in any event, the insurer was not a proper party to complain about non-compliance with that administrative rule, the purpose of which was for the protection of the claimant entitled to compensation. In light of its subsequent broad interpretation by the intermediate appellate court, see First Comp Ins. v. Indus. Claim Appeals Office, 252 P.3d 1221 (Colo. App. 2011), I consider it the duty of this court to clarify this holding of Chevron by express limitation.

¶89 As an aside, I applaud the majority for concluding, at least with regard to the workers' compensation statutes at issue here, that this court is not limited by any prior interpretation of the ICAO. I consider it counterproductive, however, to continue to mouth, as does the majority, confusing (if not deceptive) language to the effect that "courts nonetheless traditionally give deference to the Panel's reasonable interpretations of WCA provisions." Maj. op. ¶ 26. While no great harm can come of our showing deference, in the sense of a respectful consideration for the Commission's views, deference to the Panel's "reasonable interpretations" of WCA provisions implies actual acceptance of the Commission's choice among multiple reasonable

2

interpretations of ambiguous WCA statutes, more in the vein of modern federal administrative jurisprudence. See generally John H. Reese, Bursting the Chevron Bubble: Clarifying the Scope of Judicial Review in Troubled Times, 73 Fordham L. Rev. 1103 (2004). As we have indicated elsewhere, we have never adopted the federal administrative model, and it remains the obligation of the judiciary to interpret the statutes of this jurisdiction. Mile High Cab, Inc. v. Colo. Pub. Utilities Comm'n, 2013 CO 26, ¶ 12, 302 P.3d 241, 245–46.

¶90 The court of appeals' emphasis on the role given by the General Assembly to certificates of insurance in the workers' compensation scheme derives not only from the Act's specific provision for such certificates in the context of construction work but, more generally, from the fundamental compromise upon which workers' compensation was predicated. The statutory scheme was designed to grant an injured employee compensation from his or her employer without regard to negligence, and in return, the responsible employer would be granted immunity from common-law negligence liability. Frank M. Hall & Co. v. Newsom, 125 P.3d 444, 446 (Colo. 2005) (citing Finlay v. Storage Tech. Corp., 764 P.2d 62, 63 (Colo. 1988)). Our statutory scheme has also long provided an extra layer of protection for the employees of subcontractors by imposing, with some exceptions, employer liability not only on the subcontractors by whom these employees are directly employed, but also on the property owners or companies contracting out work to those subcontractors. Id. (citing San Isabel Elec. Ass'n, Inc. v. Bramer, 510 P.2d 438, 440 (Colo. 1973)). The central mechanism through which this

3

swift and certain compensation would become possible was to be statutorily required insurance, covering the liability statutorily imposed on each of these employers.

¶91 The scheme therefore imposes a duty on such "statutory employers" to insure and keep insured this broad statutorily created liability, permitting them even to recover the costs of such insurance from their subcontracting employers. By the same token, however, the scheme makes clear that neither subcontractors with employees of their own, who maintain insurance coverage for their employees as required by statute, nor their employees themselves have a right of contribution against their statutory employers. Unless the scheme intends the enrichment of workers' compensation carriers by requiring that premiums be paid by statutory employers, notwithstanding existing adequate coverage by their subcontracting employers, and forcing subcontracting employers to bear not only the cost of their own coverage but also that of their statutory employers, it necessarily contemplates some means of establishing definitively whether the liability of persons or entities contracting or subcontracting with statutory employers remains adequately covered.

¶92 With regard to construction work in particular, where the phenomenon of subcontracting employers is virtually universal, the statutory scheme actually imposes an administrative fine upon any person who contracts for the performance of construction work and fails to either provide coverage himself or require proof of coverage by every person with whom he has a direct contract. Because the statute expressly exonerates from this administrative fine any person who contracts for the performance of construction work and requires proof of coverage by those with whom

4

he directly contracts, the majority concludes that proof of coverage has significance only in the context of administrative fines and plays no broader role with regard to the liability of statutory employers. By contrast, I believe proof of coverage provided by an insurance carrier to a statutory employer—a company or property owner who would be liable for injury or death to the employees of its contractors or subcontractors but for adequate coverage by those entities themselves—actually defines the scope of the carrier's statutory obligation to provide notice before cancelling an insurance policy upon which that statutory employer's liability is contingent.

¶93    Because the effectiveness of the Workers Compensation Act depends on the maintenance of adequate insurance coverage against the liability of employers for injuries to their employees, the statute requires notice to "any employer insured by the carrier or Pinnacol Assurance" before it will be permitted to cancel that employer's coverage. See § 8-44-110. The majority accepts without reflection that in order to be an "employer insured by the carrier," an employer must actually be in privity of contract with the carrier, but this gloss is certainly not implied by the term "insured" itself, and there is every reason to believe it was not intended by the legislature. The statutory phrase "any employer insured by" clearly refers to any employer whose liability for injury to his employees is insured against, rather than simply an employer who has insured his personal well-being. Where the statutory scheme creates multiple levels of liability, in the form of statutorily designated employers, all of whose liability for subcontractor employee injury is statutorily insured against by the policy of any subcontracting employer, the better reading of the phrase "any employer insured by the

5

carrier or Pinnacol Assurance" includes all of those statutory employers to whom the insurer has certified coverage against their statutorily imposed liability.

¶94     Apart from the majority's failure to give any serious consideration to the meaning of the notice of cancellation provision, much less to examine it in light of the policy expressed by the scheme as a whole, I believe the majority's cramped reading of the role that certificates or other proof of insurance play in the workers' compensation scheme derives in part from its misunderstanding of the relationship between sections 8-41-402 and 404, C.R.S. (2015). Sections 401 and 402 treat of persons, companies, or corporations that lease or contract out any part of the work of their business, or that own any real property or improvements thereon and contract out any work done on that property. Section 404 deals with contracting for a particular kind of work—work on construction sites. Because a person who contracts for the performance of construction work on a construction site can (and almost certainly will) be a person, company, or corporation governed by section 401 or 402, the majority's suggestion that the administrative fine imposed by section 404 is somehow unrelated to the liability imposed on statutory employers by section 402 is not simply too mechanical, but in fact untenable.

¶95     From section 404's provision for a fine in the construction site context, and its express exoneration from that fine upon obtaining proof of coverage by a direct employer, the majority concludes not only that proof of coverage serves no purpose other than the exoneration of an employer from administrative fines, but also that the statutory scheme intends for separate coverage to be required of statutory employers,

6

even in the face of proof of adequate existing coverage by the direct employer. Not only does this interpretation (or more accurately imputation) imply a legislative intent to bestow a windfall on insurance carriers, in the form of double premiums for single coverage, but in addition, it effectively thwarts the fundamental goal of the scheme — to ensure coverage for all injured employees, in lieu of obliging them to seek recovery from uninsured employers. To construe the phrase in section 8-44-110, "shall notify any employer insured by the carrier or Pinnacol Assurance," as including every employer to whom the insurer has provided proof that the employer's statutory liability is insured against, would guarantee that each such statutory employer is given an opportunity to exercise its statutory right to renew coverage and pass on the cost, if it chooses, to the contractor, subcontractor, or person with whom it contracts.

¶96    Because our opinion in <u>Chevron</u> actually involved the impact of an administrative rule on the statutory scheme rather than construction of a cancellation provision of the Act, first appearing in 1989, <u>see</u> ch. 69, sec. 1, § 8-44-114, 1989 Colo. Sess. Laws 417, 418, I do not believe our holding in that case presents any impediment to this construction. To the extent it could be read to adversely affect the standing of a statutory employer to challenge the cancellation of a policy upon which its liability is contingent, I would expressly limit or overturn it. To construe the Workers Compensation Act so narrowly as to relieve Pinnacol of any obligation to notify Alliance of its intent to cancel, after certifying to Alliance sufficient coverage to protect it from claims of injury by its statutory employees, flies in the face of the fundamental compromise upon which the Act was predicated. While I therefore agree with the court

7

of appeals' understanding of the policy supporting the Act, because I believe that in the absence of notice to Alliance, the coverage by Pinnacol remained in existence, I see no need for a remand concerning reliance by Hoff.

¶97    I therefore respectfully dissent.

I am authorized to state that CHIEF JUSTICE RICE and JUSTICE EID join in this dissent.